**ALASKA PULP CORPORATION, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 95–153C.

United States Court of Federal Claims.

Jan. 28, 2004.

Terrence O'Donnell, Williams & Connolly, LLP, Washington, D.C., with whom were Ari S. Zymelman, Robert A. Van Kirk, Tobin J. Romero, Jonathan M. Landy, Juli Ann Lund, Williams & Connolly, LLP, and Michael J. Lawson, Peter N. Larson, Michael J. Coffino, Steefel Levitt & Weiss, for Plaintiff.

Robert E. Kirschman, Jr., Assistant Director, U.S. Department of Justice, Commercial Litigation Division, Washington, D.C., with whom were Assistant Attorney General Robert D. McCallum, Jr., David M. Cohen, Director, U.S. Department of Justice, Civil Division, Commercial Litigation Division Jane W. Vanneman, Virginia Farrier, Jan M. Folena, Gregory T. Jaeger, Alan J. Lo Re, and Christian J. Moran for Defendant. Of counsel: Lesli Lagomarcino, Washington, D.C., and Tim Obst, Juneau, AK, Department of Agriculture, Office of the General Counsel.

## OPINION

BASKIR, Judge.

In this decision, we address Plaintiff's claim for damages for breach of contract. On February 14, 2001, we entered summary

judgment in favor of the Plaintiff on liability on Count One of the Complaint, having ruled that the U.S. Forest Service breached a 50–year contract with the Alaska Pulp Corporation (APC) when it implemented three provisions of the Tongass Timber Reform Act, Pub.L. No. 101–626, 104 Stat. 4926 (1990) (TTRA). *Alaska Pulp Corp. v. United States,* 48 Fed.Cl. 655 (2001).

In its diligent efforts to establish damages resulting from this breach, APC presented the Court with alternative measures of damages, based on theories of expectancy, cost of cover, reliance, and restitution. Indeed, the Plaintiff laid out alternative subcategories of damages within each of its damages models. Estimates of APC's claimed injuries and the relief to which it is entitled range from several hundred million dollars to $8.7 billion, depending upon the theory. For the reasons expressed below, however, we conclude that APC is entitled to no damages.

## A LOSING CONTRACT

Before we turn to the specific factual context of this case, we posit one undeniable element of Plaintiff's circumstance: by the time the contract was breached, APC's long-standing agreement with the Forest Service was a losing contract. The market for its primary product, rayon-grade dissolving pulp, had diminished. Although the company had survived down markets over the years, its current problems were the result of market trends and other adverse circumstances that it determined would not improve in the 20 or so years remaining on its contract.

We do not need to look far to come to this conclusion. Plaintiff's predicament is found in the statements of APC President and Chairman George Ishiyama, the dominant actor in the strategic operations and decisions of APC. Although there are important gaps due to Mr. Ishiyama's contumacy in this litigation, we have much evidence of his thinking and acting as concerns major APC decisions in the 10 to 12 critical years of his service as president of the company. His true estimation of APC's economic future is revealed in the videotaped record of his comments at a meeting of APC's mill managers in February 1992. Written recitation of the transcript gives only a hollow echo of the force of the video exhibit.

In this meeting, Mr. Ishiyama declares that APC is not faced with the normal cyclical downturn—common in the pulp market, and destined to be replaced with an upturn before long, as has previously been the case. Rather, Mr. Ishiyama sees a structural movement in the world economy as it shifts from a wartime basis to a peacetime basis.

Mr. Ishiyama explains the challenges the company faces in operating to capacity and maintaining its workforce. In particular, Mr. Ishiyama describes a pulp market that is unable to support APC's inventory. He addresses the market as a function of broad changes in the economy, and his outlook is decidedly pessimistic:

> *The economic environment today is not a normal cyclical recession, in my opinion. It is something that is far more fundamental.* It is a recession that is largely brought on by the changeover from a military hardware economy, which has sustained this economy for the last 45 years, to one in which it is more related to the civilian production of the goods.
>
> It's going to take time to make that adjustment because it is not a cyclical recession, regardless of what the Government economists say. When you look at the world and look at the factors behind this recession, *it is not just a simple cyclical recession that's going to be over in a short period of time.* It's a transitional recession, and it's affected everybody. It's affected Japan and it's affected China, it's affected the Philippines—and all over the world. And all these countries are also going through adjustments.

Transcript of Mr. Ishiyama's Remarks at Mill Managers Meeting (February 27, 1992) at 2–3 (emphasis added).

APC's chief concludes that APC must also change:

> Because we are not able to sell all of the production that this mill is capable of producing and because we are pushing the inventory, *it's going to be necessary at some point in this coming year for us to*

*make adjustments to this current situation.*

*Id.* at 3 (emphasis added). But he is anything but hopeful: "We have tried very hard, all of us. And I'd like to say that things look more optimistic down the road. In all honesty, I think we still have tough times ahead." *Id.* at 6.

Mr. Ishiyama's message is clear: The hard times APC is facing are not temporary; the pulp market's decline is not cyclical, but structural. The rayon manufacturers in Japan are no longer prepared to purchase in the quantities they have in the past, and are no longer prepared to pay premiums simply because they are also APC shareholders.

Equally significant is what Mr. Ishiyama does not say. His remarks come one year after the TTRA went into effect. Nowhere in this meeting does he attribute APC's difficulties to the legislation in any respect. This is no momentary oversight. In the years immediately after TTRA was enacted, APC both talks and acts as though the Act is a minor consideration in its operations.

With this introduction, we now recite the history and facts of this case.

## PROCEDURAL BACKGROUND

### *APC's Complaint*

In its Complaint before this Court, Plaintiff alleged several theories of liability. First, APC argued the 1990–91 enactment and implementation of the TTRA was a material breach of contract excusing further performance by APC. Complaint, Count I at ¶ 63. Second, APC claimed the Government termination of the contract in January and April 1994 was unjustified and, therefore, a material breach. Complaint, Count II at ¶¶ 64–66. And finally, APC attacked the contracting officer's independence, good faith and fair dealing. Complaint, Count III at ¶¶ 67–68.

### *Motions for Summary Judgment*

The parties adopted a piecemeal approach to this litigation. First, a brood of discovery and other procedural disputes emerged and occupied the considerable attention of the Court. *See generally, Alaska Pulp Corp. v. United States,* 38 Fed.Cl. 141 (1997) (CDA jurisdiction); *Alaska Pulp Corp. v. United States,* 41 Fed.Cl. 611, 616 (1998) (motion for finding of contempt and sanctions for violation of discovery order); *Alaska Pulp Corp. v. United States,* 44 Fed.Cl. 669 (1999) (noncompliance with Rule 45 notice obviates waiver of attorney work product privilege); *Alaska Pulp Corp. v. United States,* 44 Fed.Cl. 734 (1999) (waiver of attorney work product privilege through inadvertent disclosure). Then the Court took up substantive issues on motions for partial summary judgment on liability, first by the Government and then by the Plaintiff, and then by both, each time focusing on discrete issues rather than the overall Complaint.

We addressed these substantive arguments in the order presented to us. *See, e.g., Alaska Pulp Corp. v. United States,* No. 95–153C (Fed.Cl., May 25, 2000) (unpub.) (denied Defendant's motion for summary judgment, holding that APC was not required to operate a pulp mill for the entire period of the contract, a Count II issue) (*Alaska Pulp I* ); *Alaska Pulp Corp. v. United States,* No. 95–153C (Fed.Cl., Oct. 16, 2001) (bench ruling denied cross-motions for summary judgment on Count II, finding that the facts surrounding the Government's demand for adequate assurances and its subsequent termination of the contract were in dispute) (*Alaska Pulp III* ). But ultimately, we based our determination of liability on Count I, ruling on Plaintiff's motion for partial summary judgment. We found as a matter of law that the Government's enactment and implementation of the TTRA materially breached APC's contract for the supply of timber in the Tongass National Forest. *Alaska Pulp Corp. v. United States,* 48 Fed. Cl. 655 (2001) (*Alaska Pulp II* ).

Declining to take up any further alternative grounds for liability, we commenced with the damages trial in late September 2002. This case has taken on a magnitude uncharacteristic even of the complex matters arising under this Court's jurisdiction, such as the *Winstar* litigation. The rulings summarized above, and the many intervening procedural disputes that have taxed this Court's attention, account for over 800 entries in the

Court's docket for this one case. The trial, itself, was heard over the course of nearly six weeks, culminating in a record consisting of the testimony of 50 witnesses, the admission of 5,000 exhibits, and post-trial submissions of over 1,000 pages.

## Mr. Ishiyama's Contempt

There is one witness that we did not hear from, at least not directly: George Ishiyama. The issue of his participation in this case first surfaced during discovery, and remained only partially resolved through motions for summary judgment and the presentation of the evidence at trial. Mr. Ishiyama, perhaps the most important witness for the Plaintiff in this case, has never testified.

The extended 2–year dispute on this issue is set out in Judge Margolis' opinion on the Defendant's motion for sanctions. *Alaska Pulp Corp. v. United States,* 41 Fed.Cl. 611 (1998). In the initial phases of discovery, March through December 1996, the parties jockeyed over the time, location and scope of Mr. Ishiyama's deposition. Plaintiff wanted to preserve his testimony at the onset of discovery, and agreed only to a limited deposition in Japan, where Mr. Ishiyama principally resided, because of his failing health. Defendant, on the other hand, required document discovery concerning Mr. Ishiyama's personal finances prior to deposing him, and insisted that Mr. Ishiyama travel to the United States. Government counsel proffered evidence showing that Mr. Ishiyama had traveled frequently for business and pleasure and that he, in fact, maintained residences in both California and Hawaii. By January 1997, Mr. Ishiyama was no longer willing to participate in depositions of any form.

On January 27, 1997, the Court ordered Mr. Ishiyama to undergo a physical examination to support his contentions that his medical condition prevented him from being deposed. Via individual representation, Mr. Ishiyama opposed this order, as well. Following a hearing on the matter, the Court rescinded its medical examination order. However, the Court held several evidentiary hearings, complete with expert medical testimony, to determine whether Mr. Ishiyama's medical condition precluded his deposition. On July 15, 1997, the Court found that Mr.

Ishiyama, who had suffered a minor stroke in 1994 and had coronary artery disease, was fully capable of participating in the deposition. The Court ordered the deposition to commence on August 11, 1997. Out of an abundance of caution, the Court agreed to the early requests that the deposition be held in Japan, despite evidence of Mr. Ishiyama's international travel and his active and continuing involvement with APC's policy decisions and decisions related to the litigation, since his stroke. *Alaska Pulp Corp.,* 41 Fed. Cl. at 613.

Upon receiving the protocol for the depositions, which included a number of accommodations for Mr. Ishiyama's health, Mr. Ishiyama's individual counsel informed the Court that Mr. Ishiyama would not agree to the deposition. At the Court's invitation, the Government filed a motion for sanctions. The case was stayed for nearly a year while the motion was litigated. Defendant sought dismissal of the claims and reimbursement for costs and attorneys fees, and suggested that Mr. Ishiyama be held in contempt for refusing to comply with the Court's order. As an alternative to dismissal, Defendant sought evidentiary rulings regarding liability and damages issues, including inferences in favor of the Government and suppression of evidence.

Judge Margolis issued a decision on August 7, 1998, in which he found that Mr. Ishiyama willfully failed to comply with the Court's order. *Id.* at 615. Although the Court warned that it was "extremely displeased with Ishiyama's defiance of its authority," it was reluctant to issue outcome determinative sanctions, such as dismissal or the requested evidentiary rulings, without first determining whether "Mr. Ishiyama's failure to appear for the court-ordered deposition will substantially prejudice the Government by interfering with the rightful decision of the case." *Id.* at 615–16. The Court did award costs as a sanction. However, it left open the question of the additional sanctions by permitting the Government to renew its request after it "explore[d] its other avenues of discovery, including depositions of other significant witnesses and the Rule 31 deposi-

tion by written questions of Ishiyama." *Id.* at 616.

The Court continued to grapple with this matter right up until the point of trial. The litigation of the sanctions motions had produced a last minute concession by Mr. Ishiyama to conduct a limited videotaped deposition by written questions pursuant to RCFC 31. However, this procedure yielded evidence of little import and of no consequence to the Government's defense. In the spirit of Judge Margolis' order we ordered the Government to exhaust alternative means of discovering the evidence which Mr. Ishiyama's testimony might produce. But the discovery process did not moot the matter of Mr. Ishiyama's noncompliance; many disputes ensued concerning document discovery and the depositions of third party witnesses. Near the close of discovery, we resorted to the cumbersome and politically sensitive process of deposing Japanese Nationals through written and translated questions. We imposed upon the State Department and the Japanese Judiciary to coordinate the taking of several of these depositions through the letters rogatory process.

In January 2002, the Government again sought the cooperation of APC's President, to no avail. The Government renewed its sanctions motion, arguing that it still suffered prejudice by its inability to depose Mr. Ishiyama. Defendant identified several categories of sanctions that were appropriate. First, it requested conclusive factual findings in its favor, particularly with respect to contemporaneous statements that were later countermanded by company documents. Second, the Defendant asked the Court to suppress many of the contradictory documents, as it was unable to test their accuracy through the cross-examination of Mr. Ishiyama. Among those documents is one of the Hough reports, which we address at length in this Opinion. And finally, the Government sought to exclude Plaintiff-sponsored evidence of Mr. Ishiyama's state of mind and evidence that Mr. Ishiyama's efforts were responsible for turning APC around. As Government counsel conceded, neither of these last two subjects ultimately factored in the trial.

We reserved ruling on the motion for sanctions, based on the assumption that hearing the evidence at trial would best demonstrate how the Government was prejudiced by Mr. Ishiyama's refusal to participate in these proceedings. *See* Transcript of Pretrial Conf. (Sept. 10, 2002) at 6–10. Counsel for the Government agreed to bring to the Court's attention during trial evidence that should be suppressed pursuant to the sanctions motion. *Id.* at 10–11.

During the fifth week of trial, the Court spent an afternoon hearing designated portions of Mr. Ishiyama's limited written deposition. Ultimately, the Court was also frustrated by the shortcomings of this manner of receiving evidence. We found at certain junctures that the absence of Mr. Ishiyama's testimony tended to favor the Government. Mr. Ishiyama's contemporaneous assessments of his company's operations, cemented on videotape and in internal memoranda, severely impaired the Plaintiff's attempt to establish damages. Mr. Ishiyama's self-serving video deposition comments often conflict with documentary evidence of his contemporaneous decisions and views. Potentially, government cross-examination at trial would have further undermined Mr. Ishiyama's credibility.

The Government asked us at various points during trial to reject certain documents and disregard certain testimony regarding Mr. Ishiyama, claiming that the inability to directly question Mr. Ishiyama prevented the government from adequately testing the proffered evidence. In every instance, we noted the objection and acknowledged that the evidence was subject to the pending request for sanctions. However, in most of these cases, the absence of Mr. Ishiyama's testimony did more to undermine the credibility of that evidence than perhaps the best of cross-examinations would have been able to accomplish.

Although unexplained gaps remain, the circumstantial evidence surrounding Mr. Ishiyama's communications with his employers, consultants and financiers, outweighed any self-serving testimony he might have provided. For example, Mr. Ishiyama's recorded remarks and early correspondence, which

were proffered as evidence by Defendant, were much more credible in the Court's view than later evidence attributed to him, particularly those communications that form APC's "end-game strategy," which we discuss towards the conclusion of this opinion. At the same time, we do not mean to imply that Mr. Ishiyama was an unnecessary witness in this case. As we noted above, he was the most important single witness in this case. He made the decisions on APC's operations, its strategic planning, and its future. Only he could explain anomalies in the evidence. He was the principal in dealings with APC's financiers, especially the Industrial Bank of Japan (IBJ), the company's primary source of funding. We find it most inexplicable that Mr. Ishiyama, chairman and president of APC, should risk dismissal or other severe sanctions against his company by refusing to testify.

Accordingly, while we do not rule out that the Government may have suffered substantial prejudice as a result of Mr. Ishiyama's disregard of the Court's order, given the disposition of this case, the evidentiary sanctions are moot as applied to Plaintiff, APC. We leave open the question of whether the Government or the Court may be entitled to other relief. As applied to Mr. Ishiyama in his personal capacity, any sanctions have been overtaken by unfortunate events. We were informed during the post-trial briefing in this case that Mr. Ishiyama died on February 4, 2003.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In the following pages, we offer the reader a summary version of the history of APC, the timber contract, and the relations between the company and the Forest Service from 1957 to the formal termination of the contract by the Forest Service in early 1994. We will return to some of this history when we consider the implications of these events in the context of damages.

### APC as a Japanese National Project

In October 1957, the United States Forest Service and a Japanese company then known as the Alaska Lumber & Pulp Co., Inc. (sub-sequently renamed Alaska Pulp Corporation), entered into a 50–year contract for the sale of timber in the Tongass National Forest in the then-territory of Alaska. The U.S. Forest Service permitted APC to cut timber and purchase the logs, and APC agreed to do so subject to certain conditions.

The contract required the manufacture of the raw materials harvested prior to export. APC was precluded from exporting unprocessed timber for manufacture elsewhere— this contractual restriction is referred to as the "primary manufacture" requirement. APC met the primary manufacture requirement by processing timber through a pulp mill erected in Sitka, Alaska, pursuant to the contract. Lower quality logs, which made up a large percentage of the timber in the Tongass, were processed into pulp and sold to support rayon and paper markets in Japan. In addition to pulp manufacturing, APC cut higher quality saw logs, processed locally via its sawmill in Wrangell, Alaska.

The parties enjoyed mutual benefits from the arrangement. The benefit to the Government was not what one might expect. The United States was not interested in sale of its raw materials *per se*. The advantage rested in the processing requirements. By mandating the local manufacture of forest products, the United States made productive use of its natural resources and, at the same time, triggered the industrial and economic development of Southeastern Alaska. In 1957, this was much more important to the United States than the environmental considerations that later competed with industrial policy in the region.

As for APC, the Japanese government, faced with scarce timber resources in its own country, secured a long-term source for timber products, especially pulp. Here we must reiterate this was no ordinary contract for the Plaintiff either. The consideration for the respective promises goes beyond product demand, or dollars and cents. The post World War II historical backdrop is more important. Threatened by a dearth of resources with which to rebuild its economy, Japan pursued several "national projects" including Arabian Oil, North Sumatran Oil, Ujiminez Steel in Brazil, and Alaska Pulp

Corporation. Lacking its own forest resources, access to a guaranteed supply of timber from Southeastern Alaska was critical to Japan's production of rayon, a major sector of its economy which, in turn, relied heavily on pulp manufacture. It is highly significant that Japan created four national projects, and that APC's pulp product was the first, ranking among fundamental industries such as oil and steel.

The Japanese government supported the projects by offering inducements to private companies such as APC. According to expert testimony of Dr. Ulrike Schaede, the Japanese banking system was complicit in this approach. Characterizing a "carrot and stick" system, Dr. Ulrike testified that main Japanese banks could assume the risk of bad loans, assuring the continued solvency of large corporations, with the understanding that the Ministry of Finance would back them. The national project was fueled by "extralegal administrative incentives." Tr. 4759. As Dr. Schaede described it:

[I]f companies go along with the government's wishes, they will be rewarded in the future, maybe through some license or permit or preferential treatment. Whereas if companies go against the government's wishes and "administrative guidance," they might at some point in the future face some retaliation by the government.

Tr. 4760. So it is that this company, created expressly for the purpose of performing this contract with the United States, became the first post-war national project, with full financial backing from the Export–Import Bank of Japan.

The testimony of Ms. Teresa Olson provides a clear understanding of just what the national project status translated to, as a practical matter. Ms. Olson was an account officer at Seafirst National Bank, the successor to Rainier Bank and Pacific Security, all of which served as APC's primary U.S. lender. APC's debts with these institutions included revolving credit lines for APC's operating expenses, and term loans for various improvements. The bank considered the loans highly secured—they had been guaranteed by "standby letters of credit" in varying amounts by 13 Japanese banks. Ms. Olson

described a unique arrangement, whereby senior-level bank officials continued APC's line of credit based solely on "verbal assurances that the full faith and credit of IBJ would be in support of Alaska Pulp Corporation's debt and business transactions as it related to potential losses that might be incurred by Rainier Bank." Tr. 2567.

Dr. Schaede's testimony puts Ms. Olson's observations in perspective. The company's financing by the Export–Import Bank, which is a Japanese government bank, was a clear signal to Japanese banking that APC was in special favor and should be afforded special treatment in financial matters. Tr. 4764. Ms. Olson perceived, "this loan all along had been viewed by [Rainier/Pacific Security/Seafirst] and by the Japanese banks as a quasi-governmental loan." Tr. 2577. Conversely, the 1988 discharge of APC's Export–Import Bank loan signaled the loss of APC's special standing in the Government's eyes.

APC's importance to the Japanese rayon industry is demonstrated by the fact that the company's shareholders were also its customers for its rayon-grade pulp. These Japanese rayon manufacturers invested tens of millions of dollars in APC, and never received a yen in dividends over the company's 30 years of operations.

So APC was not just a corporation with a "bottom line." The enterprise in Alaska was a symbol and an important component of the re-emergence of a strong Japanese economy. The company's ability to perform this timber contract was a matter of national pride, and an essential component in restoring the economy of war-torn Japan.

*Creation and Transformation of APC*

The pulp mill was constructed in the first few years of the contract at a cost of approximately $60 million. Plaintiff cut timber and manufactured pulp through the mill from 1961 until 1993, temporarily suspending operations on occasion for various reasons. The administration of this contract turned out to be unprofitable for APC almost from the beginning. By 1964, APC had accumulated a deficit of almost $20 million. By the mid 1970's, it owed its parent company, AP Ltd., over $60 million. But because APC

enjoyed "national project" status, profits were not the corporation's goal. Japanese investors, particularly those pulp customers in the rayon market, continued to support the venture despite its mounting economic losses, with the central purpose of supporting the needs of Japan's economy. Specifically, the goal was to supply Japanese companies with pulp from the Sitka mill. Similarly, the company's creditors continued to back APC, viewing support for this foremost national project as their obligation to the Japanese government.

In 1983, the company began a transformation. By now the contract had run half its term, and the need to support Japan's postwar recovery had been consigned to history. Mr. Ishiyama had great success running his own company in Japan and sat on the boards of several major corporations. He also had strong connections to Bank of America as its largest single individual shareholder, and to Japanese banks, especially IBJ. He was brought in to revamp the company along the lines of a typical U.S. corporation. We find it ironic that a Japanese company installed an American businessman to reshape it along American lines, at the same time as American companies were being told to emulate Japanese business practices. Mr. Ishiyama's original plan was to replace the company's unprofitable timber operations in favor of exporting Alaskan oil. But he was unable to reverse legislative prohibitions on the export of North Shore oil.

Consequently, Mr. Ishiyama set about to turn the company, and specifically the timber operation in the Tongass National Forest, into a profit-making enterprise. First he hired new, more qualified management. In 1983, he hired Mr. Frank Roppel, an industry veteran with over 25 years experience managing sawmills in the region. Mr. Roppel brought to the company extensive experience in the marketing and sale of wood products, particularly in Japan. Mr. Ishiyama named Mr. Roppel Executive Vice President, and made him responsible for overseeing the entirety of APC's operations, including the marketing of its products and the management of its facilities. He also hired Dr. Gary Bowen, a civil engineer with a number of pulp mill studies to his credit. Dr. Bowen initially served as the pulp mill's chief engineer, and ultimately attained the title of assistant mill manager, a position that gave him oversight responsibilities for engineering, maintenance, production, technical/quality assurance, and environmental compliance at the pulp mill.

The new management team went to work on reducing costs. The company had been paying a bloated workforce higher than normal wages. In 1984, Mr. Ishiyama persuaded the union to accept a voluntary wage reduction of 25 percent. When, in 1985, the union rejected a demand for a second 25 percent reduction and went on strike, Mr. Ishiyama broke the union. The company then reduced its workforce by one third. It reduced wages by 25 percent. Finally, Mr. Ishiyama launched new policies and business methods. The new business model emphasized preventive maintenance, beginning, in April 1984, with a 38–day closure of the pulp mill for extensive repairs.

In 1988, the shift from national project to self-sustaining enterprise was complete, at least in principle. A seventh and final debt restructuring of a total of $61 million resulted in the payment of principal of the 1957 Export–Import Bank loan by the principal shareholders. The paternalistic influence of the Japanese government began to subside as well. Japan's Ministry of International Trade and Industry (MITI) kept tabs on the company's position in the market, but no longer supported it. Nor did MITI solicit the financial support of other institutions, such as IBJ. In short, subsidization of APC was coming to an end. By 1994, with no government loan outstanding, APC could no longer count on IBJ to finance its losses.

### Early Legal Disputes

While over the course of time the market for pulp weakened significantly from its height, the costs associated with its manufacture increased. The timber contract became less desirable than it once was to APC and Japan. The landscape also changed for the United States. Although the promotion of industry in Alaska was still a goal of the United States, an environmental conservation agenda, dormant at the contract's inception,

made its way to the forefront of U.S. domestic policy. That and the perception that long-term contractors like APC enjoyed unfair competitive advantages over independent domestic timber purchasers in Alaska, made this contract less desirable to the United States. These issues prompted the TTRA legislation that rewrote APC's contract. *See generally*, Sen. Report 101–261 at 5–9 ("Purpose of the Measure" and "Background and Need"), H.R. 987, Mar. 30, 1990.

Even prior to the TTRA, however, disputes between APC and the Forest Service surfaced over the economic value of the timber. Under the original contract, APC designated the timber area that it would harvest in each of its 5–year timber offerings. Land-use restrictions stemming from environmental legislation such as the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 (NEPA), and the National Forest Management Act of 1976 (Pub.L.94–588), shifted the initiative to the Forest Service. With timber harvests increasingly vulnerable to environmental lawsuits, the Forest Service took a more active role in selecting the timber that was to be cut. This shift in the timber-selection initiative meant that APC no longer could ensure that the economic value of a timber offering had the highest priority. APC complained but did little more until the arrival of Mr. Ishiyama.

In 1987, Mr. Ishiyama challenged the Forest Service's practices with claims culminating in a suit in this Court (Cl.Ct. No. 675–87), seeking over $80 million in damages. The complaint alleged that the company's harvests became uneconomical because it had to endure additional expenses as a result of "patch cutting," harvesting timber in scattered areas dictated by the Forest Service's selections. During the 1981–1985 operating period APC harvested what it characterizes as "deficit timber"—timber that cost more to cut, transport, and process, than it would yield in revenue. The company's new attitude towards the Forest Service and its timber selection practices complemented nicely with Mr. Ishiyama's aggressive policy of reducing APC's labor costs.

A period of settlement negotiations resulted in the so-called "settlement contract," which was formally signed in June 1990. Pursuant to the settlement, APC acknowledged the loss of its former primary role in the selection of timber for harvesting, while the Forest Service agreed to incorporate into the contract the "mid-market test" as a means of avoiding future "deficit timber" offerings. Specifically, the Forest Service agreed that APC was obligated to take only timber offerings that met the mid-market test.

At trial, we heard the testimony of Mr. Kenneth Vaughan, the Forest Service transportation planning engineer who composed the algorithm that later became known as the "mid-market test." The test was derived from Mr. Vaughan's 1990 paper entitled *Middle Market: A Process to determine Timber Value for Analysis*. Although first employed in the settlement contract, it was devised as a method for developing Environmental Impact Statements (EIS), pursuant to NEPA. It enabled the Forest Service to analyze harvesting costs "from stump to pond log"—the industry characterization for the costs incurred up to the point of manufacturing—over the course of the cutting period covered by the EIS.

The adaptation of the mid-market test in the settlement contract was a way to reassure APC with respect to the cutting area offered by the Forest Service. The test provided a verifiable formula and benchmark for evaluating a given timber offering and presented the possibility of eliminating the disputes which had plagued earlier timber offerings. Essentially, the mid-market formula applied certain industry-based cost and pricing criteria to timber offerings to achieve an economic return on the timber, at least up to the "pond log" stage, arrival at the pulp mill. *See* Settlement Contract, § 7(c)(4)(b) (timber "would provide a weighted average margin for profit and risk of at least 60% of normal.")

But the test, as Mr. Vaughan described it, did not guarantee profits. Many factors could, and in fact did, intervene to make it unprofitable to manufacture into pulp the harvested timber that had met the mid-market test. As experience with a 1993 offering, number 7, shows, the timing of the test, the

currency of the input data, and whether cutting areas are offered separately or combined, will produce different test results. The settlement contract, however, provided other benefits to APC. It retroactively validated $10 million in previously unusable "purchaser road credits"—vouchers accumulated in the construction of roads for timber operations that had no cash value and which were redeemable up to a certain amount. Additionally, the contract changed the timber offering mechanism to protect against interruptions in timber supply. The settlement contract was signed in July 1990, and APC dismissed its litigation against the Forest Service.

### Enactment of the TTRA

The TTRA legislation, enacted on November 18, 1990, had been in the works for many years prior to the settlement contract. The statute's legislative history reveals no less than eight Committee reports in the House and Senate, dating from May 4, 1988, through November 18, 1990, and thousands of pages of floor debate dating all the way back to the 99th Congress in May 1986.

The statutory purposes of the TTRA bill evolved significantly. Congress first aimed to renegotiate APC's contract, then to terminate it, then again to renegotiate it. Early objectives of imposing a moratorium on timber sales and eliminating the Forest Service's statutory and contractual requirement to supply a specified amount of Tongass timber were subsequently restated as an intent to "modify" Forest Service obligations. Compare, H. Rpt. 100–600, pt. 1 on H.R. 1516 (May 4, 1988), H. Rpt. 101–84, pt. 1 on H.R. 987 (June 13, 1989) and H. Rpt. 101–84, pt. 2 on H.R. 987 (June 29, 1989).

Members of Congress and industry representatives alike recognized in developing the TTRA that the measure exposed the United States to potential liability for breach of contract. See Sen. Rpt. 101–261 (March 30, 1990)(Add'l Views of Sens. McClure, Burns, Nickles, Murkowski, McConnel, Wallop, and Garn) at 39. By the time the Senate Committee on Energy and Natural Resources reported the bill on March 30, 1990, APC was aware of the precise nature of the terms in Section III of the TTRA, those provisions

that resulted in the Unilateral Terms and that ultimately led to this lawsuit. The record reveals that APC had monitored the progression of TTRA as it went through the legislative process, and positioned itself to avoid "slowly bleed[ing] to death." Memorandum from Mr. Woodbury to Mr. Ishiyama: Report on TTRA Mark–Up of Mar. 7, 1990 at 2.

The Act directed the Secretary of Agriculture, as ultimate authority over the Forest Service, to modify APC's contract in accordance with the mandatory terms of the legislation. These modifications, the so-called "Unilateral Terms," went into effect on February 26, 1991. As we held in the liability opinion, they changed three material terms for which APC had bargained: (1) the contract-guaranteed "mid-market test" was made optional on the part of the Forest Service; (2) the pricing mechanism was changed to remove any advantage APC enjoyed over competitively bid independent timber sales; and (3) utility logs previously excluded from volume limits were now to be counted toward the maximum volume to which APC was entitled. TTRA, §§ 301(c)(6); 301(c)(8); and 301(c)(9). We did not find that the TTRA and the Unilateral Terms affected the supply of timber as provided in the settlement contract.

It is curious that APC signed the settlement contract in June 1990, and dismissed its lawsuit *after* the TTRA was reported from Committee. This was strange behavior for a party which later would contend that the TTRA's Unilateral Terms caused it hundreds of millions of dollars in damages. One can only conclude that APC considered the remaining benefits of the settlement contract, even as soon to be modified by the TTRA, to be well-worth dismissal of its $80 million lawsuit.

### Post–TTRA (1990–1994): Suspension of Operations and Termination of the Contract

The period between the enactment of the TTRA and the pulp mill's closure in late 1993 is the critical time for our analysis. It is during this period that APC must demonstrate the Act's harm. We offer here a brief

summary of this period which will be discussed in more detail below.

While APC objected to the unilateral changes imposed by the TTRA, we find it quite remarkable that the record is barren of any counter-proposals from APC as to how the Forest Service should implement the TTRA Unilateral Terms, either during the immediate post-TTRA months or in the years after. This passive attitude is underlined by Mr. George Woodbury's report for Mr. Ishiyama in May 1991, soon after the Unilateral Terms were issued, stating that APC should adopt a "wait and see" policy. Mr. Woodbury, the APC official assigned to TTRA matters, would repeat that assessment, explicitly or implicitly, three more times at intervals through May 1993. As late as March 1993, AP Ltd., was informing its shareholders of possible *future* TTRA impact. Neither the Act itself, nor its implementation were regarded by APC as necessarily causing the company immediate injury.

Both parties continued to render performance under the contract. In a prior ruling we rejected the Government's argument that Plaintiff thereby waived the breach, and instead found that the company was merely endeavoring to preserve the basic contractual relationship. Indeed, the entire 3–year history between TTRA's enactment in November 1990, and APC's closure of the pulp mill in September 1993, shows that both parties were operating under the unilaterally revised settlement contract. We particularly note that in this post-TTRA period the Forest Service showed no indication that it would fail to supply timber pursuant to the settlement contract, albeit as modified by the Unilateral Terms. This position changed only in 1994 in direct response to APC's closure of the pulp mill.

In June 1993, APC sued in United States District Court in Alaska, under the Administrative Procedures Act, 5 U.S.C. §§ 701–706, and the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking to nullify the Unilateral Terms and to enforce the terms of the settlement contract. *Alaska Pulp Corp. v. United States,* Case No. J93–010 (D.Alaska 1993).

While pursuing injunctive relief in the District Court, APC informed the Forest Service on June 30, 1993, that it intended to "suspend" operations of the pulp mill "indefinitely" beginning September 30, 1993. The company declined at that point to pause contract performance under section 5(a)(2), the contract's *force majeure* clause, but reserved the right to seek this option at a later date. This clause permitted brief suspensions necessitated by adverse market conditions, among other reasons. In justification for the suspension, APC cited the Government's administration of the contract under TTRA and adverse conditions in the pulp market.

Meanwhile APC appeared to explore other means of satisfying the primary manufacturing requirement of the contract, particularly the possibility of converting the pulp mill into a facility capable of producing Medium Density Fiberboard (MDF). APC dates the beginning of this exploration in May 1993, ending with the termination of the contract the following spring. The Government argues that Mr. Ishiyama had determined earlier to cease operations and that the MDF effort began at the same time that he advised APC managers of his decision. To the Government, the MDF exercise was "all hat and no cattle," designed to shift responsibility for the breakdown of the contract to the Forest Service, but never a serious proposal. The facts, as we shall see, support this conclusion. We will focus on these events in more detail in the sections that follow.

Although it had halted pulp mill operations, APC continued to harvest and manufacture hardwood timber in-State as required by the contract. Under the terms of the contract it could not cut and export pulp wood unless the wood was processed, either by the pulp mill or by some other means. However, APC was incapable of processing the lower-grade pulp wood at the sawmill. It is thus clear, as a practical matter, that there were no "other means." It was obvious, then, that APC's pulp mill shutdown and related events signaled the company's decision to withdraw from the contract.

Six months after the District Court lawsuit was filed and soon after pulp mill operations ceased, the Forest Service advised APC that closing the mill constituted a breach of the

contract. Accordingly, on January 13, 1994, Alaska Regional Forester Michael A. Barton, who served as the contracting officer for the long-term timber contract, issued a notice of termination for default. Subsequently, on April 14, 1994, he terminated the contract, alleging material breach by APC. There no longer being a contract to enforce, the District Court action was dismissed. Setting its sights on litigation here, on December 23, 1994, plaintiff filed a certified claim with the contracting officer, pursuant to the Contract Disputes Act, 41 U.S.C. § 605(c)(4), for $1,058,086,583. This case was filed March 3, 1995. The claim was not denied until November 9, 1995, and only after this Court directed the contracting officer to issue a final decision. *Alaska Pulp Corp. v. United States,* 34 Fed.Cl. 100 (1995).

The suspension of pulp mill operations has been the subject of two previous dispositive motions argued before this Court. In the first, the Government sought summary judgment arguing the contract required APC to operate the pulp mill for 50 years. We denied the motion, finding that the contractual "primary manufacture" requirement did not necessarily demand continuous and permanent operation of a pulp mill. *Alaska Pulp Corp. v. United States,* No. 95–153C (Fed.Cl., May 25, 2000) (*Alaska Pulp I* ).

In the second motion, the parties desired a ruling on whether the contracting officer's termination for default was valid—a finding which would dispose of Count II of APC's Complaint. In litigating this matter the Government actually reversed its earlier position that factual disputes barred summary judgment on the question. Joint Status Report (May 7, 2001) at 5–6; Transcript of Oral Argument (Oct. 5, 2001) at 4–7. It now asked the Court to rule as a matter of law that Forest Service termination of the contract, based on the failure of APC to operate the pulp mill or otherwise offer adequate assurances of primary manufacture, was proper. The procedural posture of the case was converted into cross-motions after the Government's change of heart. Order (Oct. 17, 2001). We denied the motions following oral argument. The question was rife with genuine issues of material fact and, there-fore, not appropriate for a ruling as a matter of law. *Alaska Pulp Corporation v. United States,* No. 95–153C (Fed.Cl., Oct. 16, 2001) (*Alaska Pulp III.*) The trial more than proved this correct.

The parties persisted in their requests to resolve Counts II and III at trial, agreeing that the evidence would overlap with evidence on damages. Defendant argued that its "adequate assurances" defense remained relevant to both liability and damages, notwithstanding the Court's ruling in favor of APC on liability under Count 1. Plaintiff, on the other hand, squarely conceded that "resolution of Claims II and III are [un]necessary for any purpose other than to resolve alternative theories of liability ... the Court has already determined that defendant is liable for total breach damages." Joint Status Report (Nov. 29, 2001) at 4; *see also,* Transcript of Status Conf. (December 7, 2001) at 16–17 (Plaintiff concedes that damages for alternative counts of liability subsumed in damages for Count I).

We agreed with the Plaintiff's assessment. Alternative grounds for liability, based on the termination of APC's contract, had become moot. By that point we had ruled in favor of the Plaintiff on Count I, finding that the TTRA constituted a material breach of Plaintiff's contract. APC was, therefore, relieved of its performance obligations. Closing the pulp mill without providing for alternate means of primary manufacturing could not amount to an APC breach. By the same token, the Forest Service's formal termination no longer would be considered a breach, entitling the Plaintiff to damages based on an improperly terminated contract. Having said this, the circumstances of the mill's closure were not irrelevant for purposes of damages. It was still open to the Plaintiff to show that the closure was a consequence of the breach wrought by the TTRA.

*The Law on Repudiation, Material Breach, and Damages*

■ A contract is repudiated when a party owing performance indicates by word or deed that it will commit a breach that would of itself give the injured party a claim for damages for total breach. RESTATEMENT (SEC-

OND) OF CONTRACTS § 250 (1981). To warrant a claim for total breach, the resulting nonperformance "so substantially impairs the value of the contract to the injured party *at the time of breach* that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." REST. 2D at § 243(4)(emphasis added). A material breach also relieves the non-breaching party of its contractual obligations to perform. REST. 2D at § 253(2).

The Government's defense at trial was consistent with its defense to Plaintiff's summary judgment motion: Plaintiff was unable to perform its contract for reasons, independent of the TTRA. In our summary judgment opinion we were guided by the Supreme Court's decision in *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), to address this defense as regards liability. Based on our reading of that precedent, we found the defense did not stand in the way of determining liability or, more specifically, the materiality of the Government's breach.

■ In *Mobil,* the Supreme Court held that legislation, analogous to the TTRA in its effect, repudiated contracts between the United States and a number of oil companies. The Court also ruled that liability stemmed from the legislation irrespective of the fact that subsequent independent events made it impossible for the plaintiffs there to perform as initially anticipated. *Mobil,* 530 U.S. at 623–24, 120 S.Ct. 2423. Similarly, here the Defendant opposed summary judgment on liability because the market, environmental requirements and APC's economic condition would have made it impossible for it to continue its performance of the contract in any event. We concluded, based on the *Mobil* decision, that APC's practical ability to continue performing the contract after TTRA had no bearing on the liability decision. *See Alaska Pulp Corp.,* 48 Fed.Cl. at 660 ("liability for breach does not turn on the economic viability of the promisee or intervening post-breach events.") It is, however, highly relevant to damages. For even in cases where the plaintiff has established a right to damages, if there is no loss, that party is entitled

to nominal damages, at best. *See* REST. 2D at § 346(2) and cmt.

The Plaintiff has relied on damages theories of expectancy, cost of cover, reliance and restitution. At the heart of each of these damages theories is a common goal—to make the non-breaching party whole. APC has a legally protected interest in being put in as good a position as it would have been in had the contract been performed, in the case of expectancy damages, or in a as good a position as it would have been absent a breach, in the case of reliance damages. *Id.,* § 344(a), (b).

The Government's theory contends that Plaintiff is indeed in "as good a position" as it would have been had there been no breach—indeed, better. It attacks APC's claims for the *benefit of the bargain*—alternative claims of $249.3 million based on operation of the pulp mill, $258.3 million based on MDF production, and $194.8 million for the facilities—by demonstrating that APC lost no profits, because it could earn no profits.

The same rationale would preclude the $71 million APC seeks in *reliance* damages. The Restatement (Second) of Contracts addresses the situation we find here, that of a "losing contract":

> [T]he injured party may ... ignore the element of profit and recover as damages his expenditures in reliance ... He may also choose to do this in the case of a losing contract, one under which he would have had a loss rather than a profit. In that case, however, it is open to the party in breach to prove the amount of the loss ... and have it subtracted from the injured party's damages.

REST. 2D at § 349, Cmt. (a).

The Government's case challenges APC's entitlement to damages by showing that APC was caught in a losing contract: The company struggled—and failed—completely independent of the breach. In fact, the Government's evidence went one step further. It made the case that APC was unable to avoid non-performance of the contract by ceasing its performance. APC must counter this defense. It must prove the requirements for an award of damages by a preponderance of

the evidence. *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002). These requirements include: causation, foreseeability, and reasonable certainty in the amount of damages. *California Fed. Bank v. United States,* 245 F.3d 1342, 1349 (Fed. Cir.2001). Additionally, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Id.* at 1350 (quoting *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521 (1960)).

 Where, as in this case, independent factors combine to harm the Plaintiff, the causation requirement is satisfied only if Plaintiff proves the breach was a "substantial factor" in causing the damages. *Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 160 (2002) (Question of whether the breach was a "substantial factor" in causing damages was an issue of material fact precluding summary judgment). As applied in the immediate case, damages are not appropriate if APC's harm is "more probably than not caused by factors general to the economy, not the defendant's breach." *LaSalle Talman Bank, FSB v. United States,* 45 Fed.Cl. 64, 98 (1999), *aff'd in part, vacated in part and remanded,* 317 F.3d 1363 (Fed.Cir. 2003).

The parties differ on the meaning of "substantial factor." The Government argues that its breach must be the single-most important factor in causing harm. APC argues the breach need only be an important—not a negligible—factor. The Government may also raise "sufficient doubts about the prospective health and profitability" of APC as a going concern, and thereby establish that expectancy damages in the form of lost profits are too speculative. *Suess v. United States,* 52 Fed.Cl. 221, 226 (2002). As we shall see, both of these themes are prevalent in the Government's defense.

 Over and above these requirements for proving damages, an award of damages cannot result in a windfall to Plaintiff. For instance, Plaintiff cannot recover damages for profits that it would not have earned absent the breach. Certainly, if we find that APC was not capable of fulfilling its own promises then its claim for damages must fail. The non-breaching party should not be placed in a better position through the award of damages than if there had been no breach. *See* 3 E. Allen Farnsworth, FARNSWORTH ON CONTRACTS 193 (2d ed.1998); *Bluebonnet Savings Bank, F.S.B., et al. v. United States,* 339 F.3d 1341, 1344–45 (Fed.Cir.2003) (citing *White v. Delta Constr. Int'l, Inc.,* 285 F.3d 1040, 1043 (Fed.Cir.2002)); *see also, Christian v. United States,* 337 F.3d 1338, 1344 (Fed.Cir.2003).

It is APC's burden to: (1) demonstrate that its lost profits are a proximate result of the TTRA; (2) establish that there would have been a definite profit; and (3) provide a basis on which a reasonable estimate of those profits can be made. *Cal. Fed.,* 245 F.3d at 1349. For the plaintiff who finds itself performing a "losing contract," it is impossible to make these showings. This Court has had recent exposure to this phenomenon in the *Winstar* context. For instance, the case *Admiral Fin. Corp. v. United States,* 57 Fed.Cl. 418 (2003), involved a financial institution participating in the Government bailout of the Savings and Loan industry that merged with a thrift at the brink of liquidation. Despite a contractual arrangement providing regulatory forbearances, the Plaintiff was financially infirm long before the enactment of the breaching legislation. *Id.* at 434. Although it was decided on liability for prior material breach, the case for damages was equally doomed. Admiral's contractual gamble never panned out—from its inception, it was a losing contract.

The Defendant continues to argue that Plaintiff should not be entitled to damages because the TTRA breach did not cause harm. Much like the typical *Winstar* plaintiff, or at least the one in the *Admiral* case, the harm was a byproduct of the regulatory pressures and market forces then prevailing in that particular industry. The Defendant is correct. The damages trial examined the effects of each of the Unilateral Terms and found the Plaintiff's case wanting. Furthermore, the Defendant convincingly established that APC was unable to render performance of its own contractual obligations, and that the Government's breach was not a substantial factor in its inability to do so. Simply

put, the contract which once held so much promise for this Japanese National Project was, by the time the TTRA was enacted and after, a losing contract. The Government's material breach presented APC with an opportunity to cease the unprofitable operation of its pulp mill with legal impunity.

■ A material breach also provides an alternate form of recovery—restitution—in lieu of expectancy or reliance damages. Restitution seeks to put the parties back in the pre-contract state, in other words, as though the contract had never been made. It does this by returning to the plaintiff the benefits its performance conferred on the defendant, less benefits it accrued itself from performance. Alternatively, restitution may consist of returning to the plaintiff its investment in the contract, so-called "money-back" restitution. *See, e.g., Mobil,* 530 U.S. at 624, 120 S.Ct. 2423; REST. 2D at § 373.

APC's principal damages theory is stated in the very first lines of its post-trial brief: it rests on "the timber ... that Defendant was to supply ... *that was not delivered because Defendant repudiated the contract."* Pl. brief at 1. This theme was repeated by APC's witnesses and in its post-trial filings, sometimes explicitly, sometimes implicitly, by reference to the timber supply provisions of the settlement contract or the Forest Service's termination of the contract in 1994 (Count II). However, in the liability phase, APC did not urge and the Court never found that the TTRA or the Unilateral Terms breached the timber supply provisions in the settlement contract. And APC counsel agreed that Count II, the wrongful termination claim, was moot. The Court has not found liability under this Count, nor has it found that APC's timber supply was ever in jeopardy. Damage claims such as cost of cover and non-use value, which are predicated on this thesis, therefore, lack a nexus to the Government's breach.

APC's strategy for proving its entitlement to damages attempted to show that the Unilateral Terms caused it harm. APC also contended that the Government's legal repudiation deprived it of an assured supply of economic timber for the remaining 20 years of the contract—and maybe 50 years after

that. With this argument, APC would have us find that TTRA caused it to cease operations in 1993. Otherwise APC is not entitled to damages for a contract it walked away from.

Plaintiff's case is unpersuasive. In enacting the TTRA, the Government did not deprive APC of an assured supply of timber. Moreover, with respect to APC's subsequent closure of the mill, Plaintiff did not meet the tests of causation and did not rebut the Government's case that APC failed for reasons unrelated to the TTRA.

Before we examine APC's effort to demonstrate the supposed damages flowing from the Unilateral Terms, we offer this telling observation. During this month-long trial, APC offered testimony of appraisers, economists, and other experts on the TTRA damages. But the Plaintiff did not offer one contemporaneous study by APC of the impact of TTRA between enactment and the end of 1993. The simple reason is that APC never evaluated the economic or financial impact of the statute on its operations. Plaintiff's CFO for over 30 years, Mr. Dennis Huse, offered two reasons for this glaring omission: (1) APC lacked sufficient information concerning the quality, price and additional costs under the Unilateral Terms; and (2) APC already knew the results were not going to be favorable based on the conditions it experienced in the 1980's. The contemporaneous record contradicts this second assertion. Repeatedly, APC officials both in Alaska and in Japan stated that they were uncertain what effects the TTRA would have in the future.

We credit the first explanation, and not the second. Mr. Huse testified that one reason the company continued to accept timber after the TTRA was that "it had an indication from the Forest Service that perhaps [the statute] would be implemented in a manner that would be acceptable to the company." Tr. 1482. This assessment comports with Seafirst Bank's credit reports on APC. One of the bank's collateral exam reports, dated January 29, 1993, indicates: "Dennis Huse, Vice President of Finance, stated it was *too early to tell the effect the TTRA* of 1990 will ultimately have on the company." Contempora-

neous analysis by Mr. Woodbury—even as late as the eve of the pulp mill's closure announced in June, 1993—belies APC's position at trial that the statute "took the heart out of" the benefits gained through the settlement contract. Tr. 256–57. The Plaintiff admitted that in the 3–year experience with the Act there was never evidence of TTRA's harmful impact sufficient to enable the Plaintiff to construct a financial model for damages.

### Mid–Market Timber

■ We previously found that TTRA's elimination from the settlement contract of the obligatory mid-market test "presents the most vivid example of a contractual *quid pro quo* contravened." *Alaska Pulp II*, 48 Fed. Cl. at 662. APC has vigorously contended that the settlement of the $80 million lawsuit was grounded on the incorporation of the mid-market standard into a new contract, which addressed APC's continuing concern for economic timber. Indeed, the "value" to the Government of the release of APC's earlier claims is, according to Plaintiff, one measure of its damages, under an alternative restitution theory. We are not persuaded.

The TTRA required the Secretary of Agriculture to ensure that timber offered APC met economic criteria consistent with that of independent national forest timber sales. TTRA, § 301(c)(9). The contractual guarantee for which APC bargained was unilaterally modified into a discretionary standard, a matter of Forest Service policy in the region. Clearly, the transformation of this mandatory contract term into a discretionary one was a material breach of APC's bargain. But damages are appropriate only to the extent Plaintiff suffers harm—actual or anticipated injury caused by the change from a mandatory to a discretionary term.

There is no measurable injury as it turns out. First, the precise assessment called for by the settlement contract was never actually applied to APC offerings during the brief 8–month period after settlement (June 1990) and before implementation of the Unilateral Terms (February 1991). The test had not yet been phased-in for those offerings because the first installment of mid-market timber was not due until late 1992. So there is no baseline to compare with the post-TTRA offerings. As Mr. George Woodbury, who had been assigned by APC to negotiate timber supply issues with the Forest Service, advised Mr. Ishiyama immediately after the TTRA was implemented, "[t]he economic timber complaint cannot be made until we are offered timber that does not meet the test." Memorandum from George Woodbury to George Ishiyama (May 10, 1991).

Second, at the time the Unilateral Terms formally did away with the contract's mid-market test, the Forest Service had already adopted a policy that applied an economic standard or mid-market test, similar to the contractual mid-market test, to all timber offered throughout the region. The terms of APC's settlement contract were incorporated into the Forest Service Appraisal Manual after the passage of the TTRA. At the time the settlement contract was executed, the application of the mid-market test to APC's long-term contract may have been unique compared to other agreements with the Forest Service. But the testimony of Mr. Vaughan and Mr. Alan Aitken leads us to conclude first that the Forest Service intended to apply the mid-market test to all Tongass Forest timber offerings; and second, that the test in the Forest Service Manual was almost identical to the contract's mid-market methodology.

The test's creator, Mr. Vaughan, testified that the measure was developed as part of the NEPA/ EIS process, and with the intent to apply it to the Alaska region at large, not simply to APC. We also received the testimony of Mr. Aitken, one of the key figures responsible for the test's implementation both before and after the TTRA. When the Forest Service ultimately adopted Mr. Vaughan's test as policy for forest management, it closely resembled the settlement contract's iteration. The only difference is that the Manual version did not set out specific "stand characteristics," as did the settlement contract version. The Manual text employed stand characteristics produced by field surveys of the particular offering. The evidence showed that the Forest Service used the best and most accurate stand characteristics available.

Plaintiff did not establish persuasively how this difference in stand characteristics harmed APC, if indeed the nominal contract characteristics were more beneficial. If the contract-driven test was more beneficial, Plaintiff would at most be entitled to the difference between the two tests. In the final analysis, we believe that the two "mid-market tests" were indistinguishable in all material respects. Indeed, the Manual version may well have been superior—it utilized the best available information on stand characteristics of the actual offering and the most up-to-date economic data.

Our conclusion is corroborated by the fact that the Plaintiff did not reject any of the three offerings evaluated under the new iteration of the mid-market test, as was its contractual right. *See* Tr. 3881 (Mr. Aitken: "I don't remember any that they rejected, although they did protest some.")

That the mid-market test was not the panacea claimed by the Plaintiff is illustrated by the circumstances of two timber offerings made under the Unilateral Terms. (A third, Offering 12, passed the test and engendered no controversy.) Offering 7 was made in September 1993 and shows how variable the test could be. Offering 7 consisted of two portions, the Appleton and the Hanus. Originally, Appleton was to be offered separately and when evaluated it failed the test. But when the two parts were combined and the test applied using more current data, Offering 7 passed the test. APC protested the Offering, but as we noted, did not reject it.

Offering 9 shows that the test was not nearly as crucial to APC as it later argued. APC urged the early offering of Offer 9, which was made on a rush basis in March 1993 and harvested a few months later. APC urged this because the offering was in an area where its operator was finishing up a prior harvest and APC wanted to take advantage of equipment already on the scene. APC never asked that the test be performed on Offering 9 and none was ever conducted.

The contract's mid-market test would not have cured APC's financial problems, nor would it have ensured an economical harvest. As Mr. Vaughan's testimony demonstrated—and as Mr. Roppel conceded during his cross-examination—APC's ability to harvest timber economically was no assurance of profits. The mid-market test could not insulate against market fluctuations or other factors affecting the profitability of pulp manufacture and sales. In fact, even after the mid-market test was negotiated, Mr. Ishiyama and Mr. Roppel noted the significance of the company's faltering pulp sales and substantial operating losses. *See* Summary of discussions from Tokyo meeting (Oct. 9, 1990).

If there is any consensus on the mid-market test, it is that it merely offered some gauge of the supply-side economics of harvesting timber. The mid-market test only gave an operator of average efficiency an opportunity to make a profit, assuming an average market and the absence of external factors not taken into account by the formula. As Mr. Woodbury candidly stated, with the inclusion of the mid-market test, APC was "still as always subject to the ups and downs of the market." Tr. 301. In the end, APC failed to offer persuasive evidence that the change from a mandatory mid-market test to a discretionary one, or the utilization of different stand characteristics in applying the test, caused the company harm.

### Timber Pricing

■ We also found that the TTRA breached contractual provisions for determining "stumpage rates," the term used to describe timber pricing. The statute required APC's contract to be modified "to assure that the price of timber offered ... shall be adjusted to be comparable with that of independent national forest timber sales, with stumpage rates and profitability criteria comparable to those of independent purchasers in competitive sales." § 301(c)(8). In the earlier opinion we summarized the statute's "effect" on stumpage rates.

The contract specified the circumstances under which rates can be determined, altered, and redetermined. Contract, § 2b-f; *see also,* Settlement Contract, § 2(b)-(e). With contractual base rates as a starting point, the Forest Service appraised the timber in a proposed sale area offering. This appraisal was performed at the time of the

offering, sometimes as many as three years before APC actually harvested in the sale area. As we noted in the summary judgment opinion: "By the time the timber was harvested, the market price could be higher or lower than the appraisal. If the market was soft, APC could minimize its logging. But if the market was strong, it could take advantage of that favorable margin." *Alaska Pulp II*, 48 Fed.Cl. at 664. In any event, the earlier rates still applied. (There is one qualification: The original contract provided for a downward-only emergency rate re-evaluation (ERR) if prices fell dramatically. The settlement contract gave the Forest Service the benefit of an upward ERR. While the ERR could potentially involve large sums, it was not the comparability price adjustment (CPA) mechanism of the Unilateral Terms, described below.)

Pursuant to its statutory directive to make rates comparable industry-wide, the Forest Service implemented a formula for determining the market price based on the price paid by independent loggers for the preceding four quarters. The resulting price adjustment, the CPA, was then applied to long-term contractors such as APC. If the market price was higher than the appraised price, APC's price was adjusted upward. As we earlier observed:

> The TTRA change thus required APC to pay the *highest* of the base, appraisal or market prices. Because the CPA was determined subsequent to Forest Service appraisals, the new system allowed the Forest Service to increase retroactively dollar prices APC would pay for timber. But if the market price was lower than the base and appraisal, APC still had to pay the higher of those two prices. As a consequence, APC was at risk of paying the higher short-term price when the market was strong. But the Forest Service did not balance this risk by allowing APC to take advantage of a soft market.

*Alaska Pulp II*, 48 Fed.Cl. at 664.

This practice of applying CPAs to the timber offered to APC was clearly a breach of the contract. In leveling the playing field for independent timber operations, the Government exposed APC to higher prices in both up and down markets, eliminating one of the incentives to operate under 5-year plans, or to commit to a long-term contract for that matter.

But APC never paid the higher CPA prices and the company felt no impact as a result of the change in the pricing formula. Nor was it likely to. The settlement contract revised the "purchaser road credit" mechanism significantly in APC's direction. Much like grocery store coupons, road credits had no cash value, but could be used to offset timber costs. Previous use-or-lose credits could now be "banked" for later use. And non-credited "road credits" previously kept off the books and unusable, now were recognized to the tune of $10 million. The evidence at trial revealed that APC offset price increases by means of those purchaser road credits during the period after the Government's breach. In 1992 and 1993, several million dollars in CPA price adjustments were charged through this method. Some $4.5 million for Offerings 1–6 were charged against the $10 million in newly validated road credits, leaving a balance of over $5 million for future charges. Of the last three offerings before termination, the only CPA impact Plaintiff established was a one-time *de minimus* $300 charge on Offering 7. No CPA was applied to Offering 9. Mr. Woodbury advised Mr. Ishiyama in mid–1992 that APC had $3 million in unused road credits, which should take them through 1992 and 1993 CPAs. Facsimile from George Woodbury to George Ishiyama (June 4, 1992).

The best evidence we have to go on are Plaintiff's own contemporaneous assessments of TTRA's impact. For instance, a December 3, 1992, letter intended for "interested friends" concedes, "[t]o date there has been no impact on cash from the comparability add-on, however the possibility is always present." Facsimile from Mr. Woodbury to Mr. Ishiyama, with attached sample letter (Dec. 4, 1992). APC made the same assessment for the year 1993. It is well established that such a contemporaneous assessment has greater evidentiary value than conflicting post hoc expert testimony. *United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746

(1948) (holding that oral testimony in conflict with contemporaneous documentary evidence deserves little weight); *see also Cucuras v. Sec'y Dept. of Health and Human Services*, 993 F.2d 1525, 1528 (Fed.Cir.1993).

The long-term impact of the CPA was entirely speculative. APC did not attempt to calculate the unknowable variables that governed the future—the state of the market, the appraisals of future offerings, bids by independent contractors, and the value of the offsetting accumulated road credits. Accordingly, Plaintiff failed to demonstrate any damages under the CPA Unilateral Term.

### Timber Volume

Finally, the TTRA affected APC's expectation with respect to the amount of timber it could cut. Previously, timber volume had been calculated to exclude utility logs, lower grade logs which APC could not produce into merchantable lumber. Typically, APC's harvest amounted to approximately 18–20 percent utility logs, meaning that in each cutting cycle APC was permitted to cut an additional 18–20 percent of the more valuable timber. The statute, and the Unilateral Terms that followed in its wake, required APC to count these logs toward its contract volume. § 301(c)(6); Unilateral Terms at B0.33 ("Utility log volume scaled after February 26, 1991, will be counted as part of Included Timber and against other contract volume requirements in effect after February 26, 1991.")

Plaintiff correctly claimed that this provision significantly reduced the maximum volume of usable timber available to APC under the contract. But the Plaintiff's entitlement to damages rests upon the assumption that APC could cut up to the maximum yield. Again, we relate back to our previous chronicle of these events. There, we set out the sum of the timber included throughout the 50–year term:

> The original contract provided for the Forest Service to sell APC 5,250,000,000 board feet of timber over the life of the contract, which extended to June 30, 2011 ... The contract specified periodic 5–year sales of timber with minimum and maximum quantities for each period. The company was to cut between 275 million and 700 million board feet of timber during each 5–year operating period. Contract, § 5c.

*Alaska Pulp II*, 48 Fed.Cl. at 666.

We also noted that certain aspects of APC's own performance potentially limited the quantity of timber it was permitted under the contract:

> The company's "entitlement" was expressed in terms of its commitment to cut, remove and ensure local processing of timber in the sale area. Consequently, the quantity cut in a given period was not fixed, but varied within the minimum and maximum range according to the amount of timber APC was able to harvest in that operating period. Indeed, both the initial contract and the settlement version contain provisions for harvesting additional timber volume in order to maintain specified operating goals. *See* Contract at § 1a(1); Settlement Contract at § 7c(2).

*Id.*

We found that it would be relatively easy to determine the effect of the statute on individual operating periods. With the imposition of the Unilateral Terms, APC's periodic harvesting opportunities were reduced by 20 percent. If it harvested the maximum of 700 million board feet of timber, exclusive of utility logs, in a 5–year operating period, it would now only be entitled to a net of 560 million board feet of saw logs in a 5–year period to stay within the 700 million total. Yet Plaintiff's claim for damages for the life of the contract is not so simple. Shortfalls in periodic harvests would prevent APC from harvesting its full 5.25 billion board feet 50–year entitlement:

> We recognize that the quantity actually harvested in any 5–year sale period was a function of cutting thresholds, operating requirements and other variables. Because the contract imposes cutting minimums and maximums for each operating period, APC might not be permitted to make up for past shortfalls. The contract provides for exceeding the permissible maximum in certain circumstances. However, the ability to make up for previous shortfalls was limited by a provision which allowed APC to exceed its 5–year maxi-

mum cut only if its cumulative average annual cut had not yet reached 110 million board feet, 1/50th of the total contract volume. Contract, § 5c. Thus, eventually, accumulated shortfalls would necessarily make it mathematically impossible to harvest the entire 5.25 billion board feet contract total.

*Alaska Pulp II,* 48 Fed.Cl. at 666–67.

Speculation on APC's ability to meet its cutting thresholds does not preclude a finding of material breach, but it is an issue that must be put to rest before APC proves its entitlement to damages. For instance, APC cannot recover for a diminished total timber volume if the company was unlikely to harvest up to that capacity.

After hearing all the evidence at trial, we find that the estimates are riddled with uncertainty. It became evident that APC could not afford to take the timber it was permitted to take. Historically, APC rarely approached its cutting maximums, constrained by its corresponding commitment to process everything it cut. Given the heavy costs of processing, this obligation grew uneconomical in latter years. APC's pulp inventory exceeded market demand, forcing the company to expand its warehouses in order to maintain its pulp mill operation and workforce.

The remarks of Mr. Ishiyama, some of which we quoted at the opening of this opinion, demonstrate this point. "[W]e are pushing the inventory," he observed. "We cannot be production-driven in a market that will not absorb the production. We have to adjust that production to what the market will take." Transcript of Mr. Ishiyama's Remarks at Mill Managers Meeting (Feb. 27, 1992) at 2.

When that did not seem to alleviate the situation, APC's President had to consider a 5–week shutdown for inventory adjustment:

As far as operating the mill is concerned, we are going to try in every way to maintain a continuity in the mill operation here. But that continuity has to be interrupted in order to balance out the inventory. We've got no place to put the pulp. No alternative, when you don't have room to put the pulp. We've got a 34,000–ton inventory capacity here and .. we increased the 4,000 in Japan to 8,000 ... [a]nd we just can't increase it any further just to maintain production.

*Id.* at 11.

If that was the situation when Mr. Ishiyama spoke to mill employees on February 27, 1992, the company's production issues only got worse after that. As we describe below, APC could not continue to process up to capacity during this period. The amount of pulp produced averaged around 140,000 metric tons, significantly below APC's rated maximum. It limited its production when lagging sales caused backed up pulp inventories. Even after an aggressive pulp sales expansion campaign, the company was able to sell only 85 percent of its pulp mill capacity. There were no plans to increase production any time soon. In fact, when some of the pulp mill's equipment failed, potentially limiting production capabilities, it was simply taken out of service.

This unilateral term became effective for the 1992 and 1993 offerings. In all the testimony and evidence with respect to Offerings 7 and 9, there is no mention of the utility log provision limiting the harvest. Thus there never was any actual experience with this unilateral term. In the end, the impact of this 20 percent reduction in cutting maximums was subject to so many imponderables as to be wholly speculative.

### Cumulative Effect of Breach

When one considers the contractual guarantees that were negated by the statute, it is easy to assume that, collectively, these broken promises must have had a devastating effect on the contractor's rights. That was certainly the self-serving testimony of Plaintiff's witnesses, and the overall theme of its case. But one need look no further than APC's actual behavior to realize that was not the case at the time.

For 2 years, APC continued to perform under the revised terms. During this period, the company was attentive to the potential impact that the statute might have on its operations. But the company perceived no actual impact. In correspondence addressed to Mr. Ishiyama, dated January 15, 1993, 2

years after the implementing regulations, Mr. Woodbury, the head of APC's timber operations, wrote in part:

> I am somewhat encouraged with George Leonard's [Associate Chief Forester] response on the "mid-market" (economic test) ... All indicate a reserved concern and a willingness to use our input on future offerings.
>
> \* \* \* \* \* \*
>
> As far as the lawsuit is concerned, we are still faced with the impacts of the utility and comparability issues. These issues, however, will in all likelihood not impact our cash in 1993. They will adversely impact the percentage of saw logs.
>
> It is clear that if we are to recover our contractual rights, all we have left is the lawsuit. We can operate in 1993 without filing suit, but our only hope for improvement in future offerings will be faith in the Forest Service to favorably modify application of the "mid-market test."

Facsimile from George Woodbury to George Ishiyama (Jan. 15, 1993).

If the TTRA clouded APC's contractual rights, it is quite apparent that APC saw a silver lining in that cloud, as it continued to operate under the contract even on the eve of its decision to close the pulp mill. The Forest Service continued to offer timber under the contract and to apply economic criteria akin to the settlement contract's mid-market test. This is the latitude that Mr. Woodbury envisions as a workable solution.

Like Mr. Huse's similar evaluation at that time, Mr. Woodbury's optimistic assessment of the future impact of the TTRA is instructive for the purposes of this litigation. But their views were of no moment to Mr. Ishiyama. As we shall see as of the date of Mr. Woodbury's message, Mr. Ishiyama had already been advised to close down the pulp mill and blame the closing on the TTRA, and he followed that advice.

### Closure of the Pulp Mill—Redux

APC's difficulties in making a go of its pulp operations came to a conclusion in September 1993, but these difficulties go back years, even decades. For example, in the 1960's, a declining market for softwood pulp left APC with a cumulative deficit approaching $20 million. Indeed, when IBJ selected Mr. Ishiyama to rescue APC, he came with a plan to abandon the timber operations in favor of converting the company to an Alaskan oil exporting business. When the statutory bar proved an unyielding obstacle, Mr. Ishiyama then turned to reforming the timber operations. Throughout the 1980's the pulp market in Japan weakened significantly due to a reduction in demand for rayon. This declining pulp market and associated economic factors drove virtually every action taken by APC up to and including the decision to shut down its pulp mill.

### Financial Constraints

In 1957, AP Ltd. received a total of $47 million from Japan's Export–Import bank, the Industrial Bank of Japan (IBJ), and a consortium of Japan's 13 city banks and four trust banks. The money was then invested into AP Ltd.'s subsidiary, APC, which was created for the sole purpose of carrying out this contract.

The trial record traces APC's economic weakness long before the enactment of the TTRA. As we earlier indicated, operation of a profitable industry was not originally APC's primary goal. For years, the company suffered losses that would have forced any ordinary company to face a debt-servicing crisis and possible bankruptcy. As a consequence of APC's status as a national project, the original loans issued by the Export–Import Bank to found the company left the Japanese government financially exposed to APC's excessive debt. As a result, the company's creditor-investors—nearly 160 shareholders from Japanese industries and business groups and trading houses—tolerated APC's mounting debt. Similarly, the 13 main banks in Japan bent over backwards to accommodate APC. The debt was safe under the "administrative guidance" policy Dr. Schaede described.

APC's chief financier, the IBJ, restructured APC's debt time and again at the behest of the Japanese government. The company's loans were restructured in 1963, 1972, 1977, 1982, twice in 1983, and in 1987.

Only 5 years into its operations, APC's accumulated deficit had reached $18.75 million. When its initial loan matured and APC could not pay the interest, the banks responded by excusing interest payments for a year.

In 1972, APC received a capital infusion by shareholders of $10 million, and another delay in its obligations to pay either principal or interest, this time for 5 years. As of March 31, 1977, the company owed $61 million, including interest. APC still could not afford to pay on the debt, so the bank restructured it again and froze interest through 1982. In April and September of 1982, the company paid off a portion of the notes owed AP Ltd. In 1983, IBJ arranged a "bail out." APC got out from under approximately $100 million of debt, in part because of the injection of cash from AP Ltd. The loans were again re-structured so as freeze principal and interest payments for 5 years. Additionally, IBJ initiated a management turnover, inserting Mr. Ishiyama as the president of the company.

Though its interest expenses were substantially lessened, APC still struggled to earn profits. By 1986, a steadily declining dissolving pulp market drove the sales price so low that APC could no longer break even. As we discuss below, APC lost its market share in the Japanese rayon market during the 1980's through a confluence of factors. In particular, the market decline, cheaper raw materials and the absence of environmental restrictions in other parts of the world allowed some of APC's competitors to cut prices during this downturn. Japanese rayon manufacturers expected APC to keep pace by lowering its price for pulp, a move that would force the company to operate at a substantial loss.

By September 1988, APC's indebtedness on the junior notes creating the company had reached $58.4 million, representing $26.5 million in principal and almost $32 million in unpaid interest. In a final debt restructuring in 1988, the shareholders agreed to repay the $61 million principal on the Export–Import Bank loan. IBJ and the other Japanese banks "shelved" an accumulated debt, including principal and interest, of 10 billion yen (approximately $85–$90 million)—APC was excused from paying any interest on this debt for 10 years.

During trial, APC's counsel attempted to rewrite the company's contemporary recognition of its unprofitable operations, and persuade the court that it had actually been historically profitable. They did so by arguing that interest and tax payments should be ignored in favor of operating income. This view of the company's "profitability" posits a world in which debts are gifts that do not have to be repaid, a world in which capital improvements and statutory compliance do not have to be funded. And taxes do not have to be paid. Such a company would have significant financial advantages over its commercial competitors. APC's profit and loss results dramatically explain its need for repeated debt forgiveness. Its early losses in the 1960's were followed by the near bankruptcy of AP Ltd. in the early 1970's. Its accumulated losses after 16 years of operation exceeded $200 million, and after more than 30 years, stood at more than $180 million. All told, over the course of 35 years, APC's shareholders contributed $200 million. APC never paid a dividend.

In the absence of Mr. Ishiyama's testimony, we do not know what influence APC's existing debt structure apparently had on its decision to close the mill. But as the following pages illustrate, APC required significantly more funding. APC needed to develop alternative products. The company faced environmental compliance costs and neglected maintenance and renovation requirements. It could not count on profits to satisfy its current debt, let alone fund these additional capital expenditures. Plaintiff's creditors were made aware of the pricing advantages of APC's competitors, particularly SAICCOR. According to Ms. Olson's review of Seafirst Bank's credit records on APC, IBJ apparently informed APC in mid–1992 that it would no longer fund short-term losses. Nevertheless, IBJ continued to back a standby letter of credit.

### Unprofitable Pulp Market

The Government made a strong case linking APC's financial difficulties to the declining pulp market, particularly the Japanese

market for rayon-grade pulp. It was the statements of APC's own officers that made the case so compelling. APC had to break into other pulp markets in short order. But its forays into those markets fell short, as we shall see.

The testimony of Dr. Norman Richards, APC's production superintendent, established that it was cost prohibitive to run the mill at less than capacity. Because there were fixed costs associated with the pulp mill, which had to be spread out over the production cycle, lower annual production meant higher per unit costs and, depending on the market price obtained for the pulp, less profits. The most cost-efficient operating level of APC's pulp mill was a maximum capacity of approximately 180,000 metric tons per year. Yet APC's Vice President testified that prior to the end of the 1990 fiscal year, APC's sales averaged less than 150,000 metric tons per year. Tr. 2344. In October 1990, Mr. Roppel described this shortfall as APC's "greatest problem." Summary of Discussions at Tokyo Meetings (Oct. 9, 1990).

The drop in APC's pulp mill production was chiefly a factor of its inability to generate sales. Throughout the late 1980's, APC's primary market declined. The company lost major customers in the United States and Mexico, as world rayon production declined two percent per year from 1977 through 1992, with a brief increase in production for the years 1988 and 1989. Rayon production in Japan—APC's largest customer base—dropped by a factor of 4 percent per year; the market went from an annual capacity of 518,700 metric tons in 1967 to 210,200 metric tons in 1992.

The decline in demand produced fewer sales and drove down the prices for the rayon-grade pulp APC manufactured. The evidence showed a constant drop in APC's pulp sales and prices from 1989, after the brief period of profits, through 1993. Yet APC needed to feed its pulp mill in order to cut timber under the long-term contract, so APC continued to process and store the pulp, even without customers.

The company built a new warehouse for its excess stores of dissolving pulp. The expanding inventories were seen as a sign of a permanent downturn in the dissolving pulp market, as we saw in Mr. Ishiyama's comments to mill managers quoted at the outset of this Opinion. Those who financed the company's operating expenses grew concerned about the inventories and the viability of replacement markets.

APC's chief addressed the market problem not only with his mill managers but also with the company's backers, during a series of meetings in Tokyo in October 1990. The company expected to lose as much as $25 million in the next 18 months due to falling pulp prices. According to Mr. Ishiyama, the company had "to seriously address ourselves to the problem of how we can reduce operating losses at reduced operating levels, because we will not be able to absorb, for long, the substantial operating losses that are currently projected." Memorandum from Mr. Ishiyama to Mr. Roppel (Oct. 18, 1990).

This gloomy picture predated the TTRA. Even then, Mr. Ishiyama considered shutting down the pulp mill. With Fiscal Year (FY) 1990, losses expected to increase from $0.5 million to $7.5 million, and with a $4.4 million decrease in pulp sales prices and a $1.1 million decrease in the value of inventoried pulp, Mr. Ishiyama directed Mr. Roppel to "take every possible step to reduce the projected overall loss for the coming year, even if that means shutting the mills down for longer periods." Memorandum from Mr. Ishiyama to Mr. Roppel (December 17, 1990). At that point in time, the company was hardly able to cover the cost of operation.

For the fiscal year ending March 1990, APC sold 148,848 metric tons of pulp. Its manufacturing cost per metric ton for that same period was $619, below the $796 selling price. In the next two successive fiscal years, manufacturing costs exceeded APC's selling price, at least for rayon-grade pulp sales to Japan.

The company's pulp sales declined between FY 1991 and FY 1992, from 152,672 metric tons to 146,139 metric tons. Other dissolving pulp suppliers were selling pulp in Japan well below the price APC was willing to offer. The company's customers informed APC that they would pursue these cheaper prices. In

424

order to preserve its market share in Japan, APC reduced the price of its pulp by $30 per metric ton for the period from April to June 1991.

Faced with a saturated and contracting market in Japan, APC embarked on a sales expansion program directed by Mr. Ishiyama, and announced by Mr. Roppel in May 1990. The strategy was twofold—expand sales in other markets, particularly the Pacific Rim, and diversify its product line. The goal was ambitious—Mr. Roppel hoped to expand sales of APC's main product, rayon-grade pulp, by 40,000 metric tons a year. Success required that APC win potential customers away from their existing suppliers, no small task. These customers would not stray from incumbent suppliers unless APC could provide pulp much cheaper. But it could not.

Ultimately, APC failed to reduce inventories or to gain new markets. Selling rayon-grade pulp to new customers outside of Japan was a dim prospect. Markets in Indonesia and China proved impenetrable. For example, sales to China, which at trial the Plaintiff advanced as a major source of "lost profits" had APC continued in operation for the remaining 20 years of the contract, actually fell. In the latter half of the 1980's, sales to China averaged 10,000 metric tons per fiscal year, but were quite volatile, ranging from a low of 5,000 tons in FY 1985 to a high of almost 20,000 tons in FY 1988.

Sales were slightly less than 14,500 tons in FY 1990, when the expansion program was started, and then fell in the succeeding 3 years, to 13,500 tons, then under 8,000 tons, and finally 5,000 tons in FY 1993. For FY 1990, APC's selling price for rayon-grade pulp to China was $806. A year later, the price was $605. And a year after that, the price had dipped to $537. By March 1993, APC's selling price for rayon-grade pulp to China was down to $530. (Note: APC's fiscal year ran from April 1 to March 31. APC data are not consistent as to whether a fiscal year is designated by the year end of the company's fiscal year—i.e., March 31, or by the beginning, April 1. Thus FY 1993 may reflect a full year before the mill closed in September 1993, or 6 months ending September 1993.)

Pulp prices in other markets, such as Taiwan, also dropped. In fact, APC's selling price of rayon-grade pulp to these customers was consistently lower than the price obtained in Japan. For example, the prices APC could obtain from rayon manufacturers in Taiwan decreased from $783.84 per metric ton in FY 1989 to $557.02 per metric ton in FY 1992. In 1993, prices in Taiwan fell to $497.17 per metric ton.

As of January 1992, pulp sales were a mere 85 percent of the mill's capacity. On January 3, 1992, Mr. Roppel instructed all APC department heads that "until we can get pulp prices increased and sales volumes equal to our most economical production level, we need to operate in a survival mode by limiting expenditures to what we must have." Tr. 2373–74. This desperation led to intentionally overlooked maintenance and the failure of a "digester," which we address later.

Mr. Roppel candidly expressed his growing concerns about the lack of profits. In a February 12, 1992, memorandum to Mr. S. Sauma, APC's head of personnel in AP Ltd.'s office in Tokyo, Mr. Roppel states:

We are all concerned about the pulp sales volume for this next year at Sitka.... It is my fear that, if our sales continue to decline, we will fall below a threshold volume in which the overhead costs will be so high that there will be no way for us to be considered a viable operation.

Tr. 2377–78. In fact, the company had already reached this point with respect to one of the non-Japan markets it sought to capture. In January 1992, APC abandoned its attempts to market pulp in Indonesia; at $575, the price was too low for APC to even recover its manufacturing costs.

Ultimately, APC's South Africa based competitor, SAICCOR, won this business by offering pulp prices as low as $445 to Indonesia, in exchange for 18,000 additional tons of pulp sales. Mr. Roppel admitted at trial that the South African pulp mill was APC's main competitive concern in 1992. SAICCOR incurred much lower costs and, able to "underbid" APC's prices, exercised significant control over world pulp prices. SAICCOR was not burdened by environmental treatment

facilities and paid lower wages than its U.S. counterpart. In addition, SAICCOR threatened to add to the market surplus problem—the company had announced plans to expand its production capacity to 600,000 metric tons by 1994. There was no viable means of competing with SAICCOR, the company which Mr. Roppel called a "900 pound gorilla on the block." Tr. 2415.

By February 1992, APC had expanded its inventories in Sitka from approximately 23,000 tons to 33–34,000 tons, and had expanded inventories in Tokyo from 4,000 tons to 8,000 tons. Again, the company was in an unenviable position. It had to make what it clearly could not sell in order to accommodate the practical need to sustain pulp mill operations—to maintain the workforce, keep operating costs down, and meet cutting thresholds. Even so, as Mr. Ishiyama cautioned the mill managers in his February 27 visit, this inventory surplus would ultimately compel the company to make adjustments—a temporary shutdown.

For the time being, however, APC operated at a reduced capacity, while costs in maintaining the pulp mill remained fixed. During this period, it was determined that only a price of $700 per metric ton would allow APC to break even. As we discussed above, the competition and market surplus made it impossible to obtain these prices for standard rayon-grade pulp. Consequently, in 1992 APC was operating with a "negative gross margin"—the pulp mill's costs exceeded its revenue. *See* Loan Progress Report (Aug. 24, 1992). From 1989 through 1992, the price APC was able to obtain from its Japanese customers dropped from $790.99 per metric ton in FY 1989 to $623.81 per metric ton in FY 1992. The price dropped even further to $594.54 per metric ton the following year.

Meanwhile, as we shall see, neither the specialty pulp expansion program nor the MDF conversion project showed much promise. By December 1992, APC's leadership understood that the inventory problem could not be solved in the near future. In a December 23 report discussed at length below, APC's consultant, Mr. John Hough, advised: "the demand [for dissolving pulp] is declining

by 4 percent annually in APC's strongest market area. This trend is not expected to reverse. More likely, it will get worse." Tr. 1386–87.

Nearly everyone involved with APC saw the market forces as a major threat to the continued viability of the company's operations. In May 1993, APC estimated that dissolving pulp capacity exceeded demand by about five percent. In September, just prior to the closure of the mill, APC's consultant on the specialty pulp program, Mr. John Hinck, wrote: "inventories have risen to the highest levels I [have] ever seen—People just are not buying." American Pulp Institute Report on Production Inventory (Sept. 6, 1993); Tr. 2632. And demand was expected to be driven down even more in the year to come, according to Mr. Hinck, with an additional 200,000 tons of pulp entering the market from competitors in South Africa, Brazil and China. Contrary to the enthusiastic post hoc estimation of APC's witnesses, at the time APC officials regarded the company as poised for anything but success.

### *Expansion into the Specialty Pulp Market*

The second part of the expansion program involved moving into the specialty pulp market. The speciality pulp program was under the direction of assistant mill manager, Dr. Gary Bowen. According to Dr. Bowen, the development of these products was critical to APC's survival. Nonetheless, APC had little success in getting the program off the ground. A number of forces worked against it during the brief flirtation with specialty-grade pulp in 1992 and 1993. The company did not have the sales structure in place to make this dramatic shift to new product markets. Without an existing customer base, APC had to offer a highly superior product at a good price in order to woo customers from their existing suppliers.

Mr. Hinck was brought on as a consultant on specialty pulp development. Mr. Hinck came from SAICCOR, the South African company that undercut APC's prices. Introducing Mr. Hinck at a mill manager's meeting in February 1992, Mr. Roppel ribbed his new employee:

[T]he problem John has is that he promises more than we can deliver sometimes. In terms of quality he has more confidence in us than we have in making the pulp, but we're going to try and keep up with you John.

Transcript of Mr. Roppel's Remarks at Mill Managers Meeting (February 13, 1992) at 26.

Mr. Roppel's comments proved prescient. The testimony of Mr. Masahiko Tokunaga, the sales specialist at AP Ltd., APC's parent company in Tokyo, described Mr. Hinck's projected sales volumes for specialty pulp as "ooburoshiki"—translated by our courtroom interpreters as "wishful thinking." Tr. 1093–94.

One "success" story that APC pointed to at trial involved a contract with Radford Arsenal, an Army ammunition plant, to supply nitration-grade pulp. However, this example demonstrates how difficult it was for APC to shift to specialty pulp production and sales. APC's manufacture of Radford's product—an extremely high density nitration-grade pulp—was dramatically limited by APC's equipment. It took APC two years of effort to make the sale, and the company used its political weapons to do so. It went to "the top" of the Defense Department and enlisted the staff of Alaska Senator Ted Stevens, a member of the Appropriations Committee.

The magnitude of the APC effort seems in retrospect to be out of proportion to the issue at stake—what was involved was a one-time-only order for 700 tons, a modest part of the equally modest 4,921 ton total of specialty pulp produced that year (a mere 3 percent of APC's total FY 1992 pulp shipments.) For APC to regard this as a success story illustrates the puny nature of its specialty pulp program.

Other obstacles to a successful development of a specialty pulp program were the manufacturing conversion and environmental issues. APC's pulping equipment required extensive overhaul for specialty-grade pulps. As Dr. Bowen testified, the mill just did not have the capacity to produce many of the specialty pulps. The production of higher grade pulps was also limited by the environmental treatment of the pulp mill's effluent. The high costs associated with required environmental modernization was yet another constraint on its efforts to diversify.

Specialty pulp was a particularly competitive market. Mr. Ishiyama admitted to his mill managers: "I think the difficulty to sell that pulp even though you have the grade was underestimated." Transcript of Remarks of Mr. Ishiyama at Mill Managers Meeting (Feb. 27, 1992) at 16. He estimated that the process of going from "anticipation to actual business" in the specialty pulp market was as much as a year away. Id. at 17.

In the end, APC's entry into new pulp markets failed. In a confidential memorandum to APC's parent company in Japan, Mr. Roppel wrote of the effort to gain specialty pulp customers:

[I]t doesn't seem that we are making much progress in persuading those companies who could use our products to switch their purchasing from previous suppliers to Alaska Pulp ... It is my fear that, if our sales continue to decline, we will fall below a threshold volume in which the overhead costs will be so high that there will be no way for us to be considered a viable operation.

Memorandum of Mr. Roppel to Mr. S. Sauma, AP Ltd. (February 12, 1992); Tr. 2377–78.

He echoed some of these concerns to APC's mill managers at a meeting the following day, pinning the blame for the lack of new customers on the competitive market, APC's inexperience in that market, and the reluctance of potential customers to take a chance on a new supplier. Mr. Roppel began his remarks that day by admonishing his employees to take greater care of their product, because new customers had made legitimate complaints. Later, when answering questions on the expansion program, Mr. Roppel came full circle and demonstrated how even the perception of quality problems could kill new business.

As of March 1992, APC's production of specialty pulp had not expanded beyond 3 percent of its total sales. Of a goal of 12,500 metric tons per year, specialty pulp never amounted to more than 5,000 tons. Soon afterward, in a mill manager's meeting held

July 23, 1992, Mr. Ishiyama admitted that the expansion effort had not succeeded:

> We have not been able to penetrate the market for the specialty pulps, which we had hoped would enhance the economics of the overall operation. We have not been able to come up with the quality that the market demands yet. We're working on it, but we haven't gotten there yet.

Transcript of Mr. Ishiyama's Remarks at Mill Managers Meeting (July 23, 1992) at 8–9.

### The Mill Managers Meetings

We have already quoted extensively from meetings of the mill managers at which Mr. Ishiyama and Mr. Roppel, primarily Mr. Roppel, addressed the staff in Sitka. We have carefully reviewed the transcripts of these meetings for the insight they give to the thinking of APC's leadership in the early 1990's. At the risk of duplication, we revisit them here.

A broad range of topics was discussed: timber supply problems stemming from injunctions against the Forest Service, the result of lawsuits by environmentalist groups; rumblings about the Teamsters organizing labor at the mill; falling pulp prices and the company's inability to compete with certain manufacturers; product complaints; and the need to develop specialty pulp and gain more customers. *See, e.g.,* Transcript of Mr. Roppel's Remarks at Mill Managers Meeting (July 19, 1991) at 1 (discussing its attempt to remain competitive in the saturated market: "We've cut the price down to the point where it doesn't seem like it's hardly worth making it, but the volume is there, so we feel pretty good about it.")

Of particular concern to the APC leadership was the increasing burden of environmental compliance, and they returned to this issue often. Earlier, we observed that by the 1980's environmental pressures started to affect the contract. New environmental laws required investment in pollution control measures. Mr. Ishiyama stated APC had spent approximately $90 million during the life of the pulp mill on water and air emission controls. APC's pulp mill brochure indicates the company spent $55 million on items such as installation of waste water treatment facility. For example, in January 1988, Mr. Roppel acknowledged that the company had underestimated the costs associated with strict environmental regulations, along with the growing list of maintenance issues. His advice to Mr. Ishiyama: these costs are "expected to continue into next year and beyond." Memorandum from Mr. Roppel to Mr. Ishiyama: Management Report for Dec. 1987 (Jan. 25, 1988) at 3.

Going into the 1990's, APC faced staggering environmental compliance costs. Of particular concern was the task of modernizing the mill in order to gain permits under the Clean Water Act's National Pollutant Discharge Elimination System. The evidence placed these costs at over $100 million, including $79 million in chlorine treatment expenses for their bleach plant. This figure was disputed. APC contended at trial that an alternative and much cheaper means of accomplishing chlorine reductions would cost only $12 million. The "eleventh hour" revised figure is questionable in light of Plaintiff's own contemporaneous estimates. As late as December 1992, Mr. Roppel was using the $100 million estimate and Mr. Evensen was using it in May and June 1993. *See* Memorandum from John Hough to George Ishiyama (Hough Report) (Dec. 23, 1992) at 3; Tr. 1389. The mill closed before any investment had to be made, so we do not know what the actual cost might have been. What is important for our purposes is that APC was considering the higher of the compliance costs in late 1992, and evidently this higher exposure was a factor in Mr. Ishiyama's decision to close the pulp mill. This is clear upon viewing the contemporaneous evidence.

In his "demise of the pulp market" speech to mill managers in February 1992, Mr. Ishiyama blamed environmental costs, and the contributing factor of the declining market, as the major problems causing operational losses in the 1990's:

> Our operating losses are not just due to the depressed situation in the pulp business. It is also [due] to the large expenses that we have to incur to keep the air clean, keep the water clean. We are spending

probably over $5 million a year to keep the water clean and keep the air clean. This money has to be borrowed. And when you borrow this money, you have to pay interest on it. And all of this adds to the operating loss of cutting the timber, processing it, selling the pulp.

It's kind of disheartening at times when you work so hard and you finally wind up with results like we are anticipating for this year and for next year.

Transcript of Mr. Ishiyama's Remarks at Mill Managers Meeting (February 27, 1992) at 5.

At that same meeting, Mr. Ishiyama also blamed environmental enforcement and litigation for timber supply problems:

We have not been able to [accumulate timber to carry the company through poor years] because we get harassed by the environmentalists on the cutting of timber, so that our timber supply is very sporadic. And even today, with a ruling from the Ninth Circuit Court of Appeals, we still don't know when we can cut that timber. And also, the restrictions that are continuing to be imposed upon us by the EPA, we have no way of evaluating what they're going to be in the future.

*Id.* at 6.

He predicted the financial problems that would follow:

When you go to the bank under the present economic circumstances and you ask for money to cover operating losses, they want to know when the losses are going to stop. They want to know how you are going to pay the money back. *There's nobody in the present circumstances who can guess with any accuracy, any intelligence, as to when this economy's going to get better—in our case, when we can be profitable . . .*

*Id.* at 4–5 (emphasis added).

In July 1992, Mr. Ishiyama made another appearance at the pulp mill in Sitka, Alaska, this time to announce a slight wage increase for its workers. He prefaced the announcement with an apology for the meager raises; again, APC's chief executive blamed the costs of meeting environmental regulations:

Our major problem is the environmental. And we are being asked to do things, to have to meet standards as if this mill were not in existence. And that, to me, is impossible, because the fact of life is the mill is here.

We have spent close to $90 million since the mill was constructed to put in water and air emission control equipment. The operation of this equipment is costing us about $16 million a year, when you include the operating costs, depreciation, and the interest on the funds that have been involved for this equipment.

Transcript of Mr. Ishiyama's Remarks at Mill Managers Meeting (July 23, 1992) at 4.

Just prior to making those remarks, Mr. Ishiyama had met in Seattle, Washington, with several officers of Seafirst Bank, APC's source of operating loans. Evidently, during this period of time, APC's domestic financier had expressed concerns regarding its exposure in APC, and whether IBJ continued its financial support of the company. Addressing the company's financial position, Mr. Ishiyama informed Seafirst that if APC were required to invest $50 million or more in environmental compliance equipment, as anticipated, "there is a good possibility that APC would be closed down." Call Report (July 17, 1992); *see also,* Seafirst Bank Interoffice Correspondence, Call Memo Regarding George Ishiyama/Alaska Pulp (July 1, 1992) ("George indicated that about $50 million of new investment would be needed to introduce the latest technology and to meet environmental requirements. Market conditions prevent this option from being a viable alternative at this time.")

Having advised Seafirst of the potentially fatal impact of increased environmental costs, Mr. Ishiyama warned his mill managers that he anticipated substantial difficulty in obtaining further funds for new environmental facilities:

Under the circumstances, it would be extremely difficult for this company, under the present financial circumstances, to come up with any appreciable funding for additional facilities.

Transcript of Mr. Ishiyama's Remarks at Mill Managers Meeting (July 23, 1992) at 5.

From a broader perspective, what is remarkable about these meetings—where every problem APC faced in its operations is discussed—*is the absence of any discussion of the TTRA.* Mr. Roppel repeatedly warned of the possibility the mill would be temporarily shut down in April 1992. But he never invoked the TTRA as a reason for this shutdown. *See, e.g.,* Transcript of Mr. Roppel's Remarks at Mill Managers Meeting (January 23, 1992) at 5 ("A lot of our problems are worldwide pulp market. As far as pulp supply itself is concerned, there's too much of it and too few customers."); Transcript of Mr. Roppel's Remarks at Mill Managers Meeting (February 13, 1992) at 8 ("[W]e had talked about the possibility of having to take a shutdown because our warehouse was filling up and the situation of the pulp wood is still bleak."). In addition to the sparse pulp market, the company blamed non-TTRA related injunctions affecting the Forest Service's supply of timber. As one participant in the audience of a mill managers meeting put it, "[W]ithout something favorable out of the Ninth Circuit, it's going to be a lean, lean spring." *Id.* at 10. In all of these meetings Mr. Ishiyama made but one passing reference to the TTRA:

> As far as the Forest Service is concerned, we are getting the raw materials for both the Sitka and the Rangel [sic] mill on a reasonably satisfactory basis at the present time. But there are many problems, many uncertainties regarding the future availability of logs under our long-term contract.

> It is partially due to the [Tongass] legislation that was passed recently and its interpretations. And it is also due to the interpretation of the long-term contract itself. At the present time, we have enough wood between the long-term contract and the purchases in the open market to keep this mill wooded through this fiscal year. We start in April 1, 1992, and go through March 31, 1993.

Transcript of Mr. Ishiyama's Remarks at Mill Managers Meeting (July 23, 1992) at 2. In that same meeting, however, Mr. Ishiyama identified APC's "major problem" as the costs of environmental compliance. *Id.* at 4.

When discussing the Spring 1992 shutdown, Mr. Ishiyama blamed not the TTRA, but the saturated market and resulting overcapacity of APC's pulp inventories. He indicated there was "[n]o alternative" but to shut down the mill "when you don't have room to put the pulp." Transcript of Mr. Ishiyama's Remarks at Mill Managers Meeting (Feb. 27, 1992) at 11.

These contemporaneous assessments are especially probative in evaluating APC's subsequent claim that the TTRA caused damages. *See, e.g., Cal. Fed. Bank v. United States,* 54 Fed.Cl. 704, 710 & n. 12 (2002) (disregarding witnesses who "testified that management worried almost daily about the impact of phasing out goodwill," where contemporaneous videotaped remarks of bank's vice president revealed that bank's falling stock price was prompted by economic recession, not by the Government's implementation of FIRREA.)

The absence of any substantive comments on the impact of TTRA in the mill managers meetings is matched by private observations of other APC officials, such as Mr. Huse, who months later was quoted as saying that it was still too early to make an assessment of the Act.

### Maintenance Costs

When Mr. Ishiyama took over control of APC, the company instituted a strict preventive maintenance regime, a sharp reversal of the previous management which had addressed maintenance only when breakdowns occurred. Under the leadership of Mr. Ishiyama and General Manager Frank Roppel, APC followed a definite program of anticipating maintenance issues and responding to them as early as possible. It is thus noteworthy that as early as December 1990, APC's financial situation affected its maintenance program.

In December 1990, Mr. Ishiyama scaled back maintenance at the pulp mill, limiting expenditures to critical needs. APC started showing signs that it might soon abandon entirely the operation of the pulp mill. On

multiple occasions, Mr. Bowen was told not to expend funds for equipment that the assistant mill manager felt was required. The company declined to perform overdue maintenance on several of the pulp mill's eight wood digesters. The digesters, large "pressure cookers" in which wood chips are treated with acid, are integral pieces of equipment in the pulping process. The digesters required constant maintenance, which entailed taking one of the digesters off-line temporarily. Down time should be limited because production for the entire pulp mill suffered—depending upon the grade of pulp (rayon-grade versus specialty pulps)—even with only one digester out of commission.

A turning point came in late 1992, when Dr. Richards reported the imminent failure of the Number 6 digester and recommended a substantial overhaul. Replacing the digester would have saved APC approximately $1.5 million per year in manufacturing costs, not to mention the potential disruption in operations should it fail. Yet the expenditure of an estimated $2–3 million to renovate this equipment was never approved. The number 6 digester ultimately failed in February 1993 and was never repaired.

Nor was there any affirmative response to the indications that other digesters would be threatening breakdown without immediate attention. None of the digesters had had their linings replaced (a $600,000 expenditure) in over 10 years, well beyond the 5-year limit. The digester that failed had not received a new lining in 19 years. Numerous authorization requests went unfunded during this period. The maintenance budget was all but ignored, leaving Dr. Bowen unable to plan maintenance for the next fiscal year, in his own words "a very strange circumstance" and "a potential clue" that the pulp mill was going to be closed. Tr. 1015–16.

The February 1993 decision to leave digester 6 out of service and the refusal to fund repairs on other failing digesters, or to finalize a maintenance budget, must have been a disquieting signal to staff and workers. As Dr. Bowen testified, "it [was] definitely an abnormal situation." Tr. 1019. It came, as we shall see, at a particularly decisive time in APC's history.

## The Hough Reports

In May 1992, Mr. Ishiyama hired Mr. John Hough, a public relations expert and self-styled "issues management" and "image and reputation management" consultant. Tr. 1298. According to Mr. Hough, his assignment was to "make an independent, sort of one-step removed analysis and review of the company's operations ..." Tr. 1303. At about the same time Mr. Hough began his assessment of APC's future, Mr. Ishiyama began a series of financial transactions involving APC-related companies which resulted in a distribution to Mr. Ishiyama of more than $20 million.

In time, Mr. Hough produced two reports, a first or "draft report" dated September 16, 1992, and a "final report" dated December 23, 1992. The reports disclose the thinking of top APC officials about the difficulties the company faced. The reports also reveal the public relations strategy APC was to follow in the "end game" period, a strategy, we note, that included this litigation, as well. In particular, the reports contrast in dramatic form the disconnect between the company's internal assessments, and the public posture the company adopted. Internally, company officials continued to regard the TTRA as a minor potential problem. But for the public it was portrayed as the major, if not the sole obstacle confronting the company. We discuss the reports at length.

Despite his statement to the contrary, the evidence compels the conclusion that the reports are not simply Mr. Hough's independent work product. Rather, they are a collaborative effort of the input of APC officials, including Mr. Ishiyama. Mr. Hough based the reports on his past experience and judgment, and "outreach and research," including interviews with APC officials, primarily Mr. Roppel, who among other things, gave him the $100 million figure for environmental compliance cited in the December 23 report. In particular, Mr. Hough was briefed on contract issues by APC counsel. Mr. Hough made no independent analyses.

The reports, especially the December report, also reflect Mr. Ishiyama's views. In

Mr. Hough's facsimile cover sheet transmitting the first report, he describes the enclosure as a "draft report" and invites the chairman to "give me any final instructions and I will incorporate them. As soon as you are satisfied with the text, I'll produce the final document." Mr. Ishiyama conveyed his views through "occasional face-to-face visits, telephone conversations, and the exchange of memoranda." Tr. 1415. Ms. Patsy Ishiyama, Mr. Ishiyama's daughter, was also used as a "go between" during this period. To a considerable extent, then, these reports are the voice of Mr. Ishiyama, as well as Mr. Hough.

Mr. Ishiyama clearly thought well of Mr. Hough's work. He adopted Mr. Hough's thesis that there had to be a radical change in the company's direction, and Mr. Hough's recommendation to close the pulp mill. He implemented Mr. Hough's public relations strategy to support that decision, and employed him to execute that strategy. Mr. Hough became a director of APC soon after and remained so when he testified at trial a decade later.

The two reports summarize in stark terms the daunting obstacles the company faced and the dismal future ahead. As Mr. Hough recalled, the first report was "very, very general":

But I think if I had to summarize my first report in a few words they're likely to be something like, Mr. Chairman, the status quo will not work in the future. Something has to change. It's time for the company to begin to make an assessment of alternatives and to look to the future with the thought in mind that, you know, something significant has to change.

Tr. 1306.

The executive summary minces no words. It begins:

It would be difficult to find another business or industry facing as many potentially overwhelming pressures, challenges and uncertainties as the Alaska Pulp Company's operations in Southeastern Alaska.

Hough Report (Sept. 16, 1992) at 3.

It goes on to describe the "near hostile circumstances" in which APC operates, identifying the two main factors:

On the one hand, new federal and state rules require the company's mill to meet increasingly aggressive and expensive air and water pollution regulations. On the other, new forest practice restrictions, Native Alaskan subsistence claims and timberland wilderness withdrawals have limited and will continue to further limit the supply of raw product.

*Id.*

The summary also points to APC's "nearly obsolete" single-mill corporate structure, compared with the more modern integrated structures of its competitors. Moreover, in this "defining moment" the company can expect "new and tougher regulations" by the EPA and Forest Service. In particular, APC management anticipates tens of millions of dollars will be required to meet new air and water quality requirements:

To continue to operate will require a renewed commitment by the Industrial Bank of Japan to fund substantial new air and water pollution abatement technology and to accept higher costs for the procurement of raw materials.

*Id.*

The report's final prescription:

A prudent course of action at this time is for the company to review its options, *its viability, its finances and its commitment to the continued operation of APC.*

*Id.* at 4 (emphasis added).

The report proper begins with a discussion of the adverse environmental aspects of the pulp mill, noting—incorrectly—that it was recently featured in a national news story as one of the Nation's 30 worst polluters. In addition to new environmental requirements, the report also notes the hostility of the environmental community to the long-term contract itself, which it sees as both environmentally damaging and uneconomical for the United States. The report foresees efforts to have it canceled.

The report concludes by urging management "to quietly explore alternatives" to continued operations, including full or partial sale, changes in corporate structure, "a nego-

tiated buy-out" of the remaining years of the contract, and the mill's outright closure. But Mr. Hough did not consider all these alternatives viable. Some were included for completeness. There is no doubt that even at this point he saw the mill closure as the likely denouement. With a final warning about the "formidable strength of the organized environmental movement," the report ends: "If any viable alternative other than closure is possible, the leadership should seek its implementation." Hough Report (Sept. 16, 1992) at 11.

Mr. Hough's first report is noteworthy for what it says and what it does not say. Clearly, expensive new environmental requirements and the hostility of the environmental community are stressed as the major obstacles APC faces. The report urges a recognition that drastic changes will be required and suggests mill closure may be inevitable. Although the report refers in passing to the Alaska Native Claims Settlement Act, the TTRA is not mentioned once in the 11–page document.

The final report is dated December 23, and it clearly reflects critical strategic decisions about the public relations campaign that were made in the interim. In November, Mr. Hough drafted and forwarded to APC leadership proposed letters to go to community leaders and other potential supporters. In contrast to the September report, which did not expressly mention the TTRA or its impact, the draft letters focus explicitly on the TTRA and the three Unilateral Terms as the major if not the only problem facing the company. With one important exception—it incorrectly charges the Forest Service with having "abandoned" the mid-market test— these drafts describe the nature of the statutory changes in straightforward fashion. But they omit any specifics about their impact on the company. Compared to later iterations they are comparably mild in tone. Yet the draft's focus on the TTRA contrasts sharply with a contemporaneous evaluation by Mr. Hough. In a memorandum dated November 16, 1992, he summarizes developments since the September report and makes only passing reference to the Act:

What has occurred in the past month or two is not encouraging. The markets for the product seem to be weakening. The USFS administration of the Tongass Reform Act is not helpful, and water quality issues look like they will continue to require further compliance work by the company.

Memorandum from Mr. Hough to Mr. Ishiyama (Nov. 16, 1992); Tr. 1382. And he continues: "[I]t remains that APC's business opportunity is very limited with no real prospects for a significant turnaround. I really think you should confront the bank with these realities." *Id.* at Tr. 1383.

Based on discussions with APC leadership, including Mr. Ishiyama directly and indirectly through his daughter, Mr. Hough forwarded near-final drafts two weeks later. The new draft letters start right off by citing the TTRA in the very first paragraph. The statute's "realities are apparent, and they already have had considerable negative effect on this company." At this time, we recall, no harvesting had been made under the TTRA terms, no studies of its impact had been made, and Mr. Huse was telling Seafirst bank "it was too early" to tell TTRA's impact on the company. Tr. 2541. There is no apparent explanation for this change of tone.

The later two versions of the letters differ from each other mainly in the extent of the description of the Unilateral Terms, with the shorter letter containing an information sheet that describes the statute at more length. The letters seek only unspecified support for future efforts to have the Forest Service modify its application of the statute.

The December 23 final report represents a major change in emphasis and content from the first draft, and even from the comparably mild draft letters of November. In one respect, at least, the introduction is as pessimistic as before. Referring to APC's business opportunity today and in the future, it observes: "It is not a bright picture today. Further, there is little to suggest a bright picture in the years ahead, just the opposite." Hough Report (Dec. 23, 1992) at 1. But now there is no doubt as to the culprit:

Most notably, during the 1980s, the environmental community of Southeast Alaska

and the major national environmental organizations succeeded in passage by Congress of the Tongass Reform Act of 1990. *Id.* at 2.

The report then itemizes the problems facing the company. This list includes many of the circumstances discussed in this Opinion, and additional ones as well. In brief, they are:

- *Dissolving pulp markets:* Declining 2% annually and 4% in Japan, and the trend is getting worse;
- *Industry costs:* American costs from environmental requirements have gone up while foreign competition has lower labor, fiber and environmental costs;
- *Fiber supply:* Federal legislation such as the Native American Claims Settlement Act, TTRA and Forest Service administrative actions have recently resulted in "more dramatic reductions";
- *Fiber costs:* The Unilateral Terms have "resulted in unacceptable pricing for natural resources to operate the pulp mill";
- *Environmental regulation:* Increased capital and operating costs for expected new environmental requirements beginning as early as 1994 could total $100 million over the next 5 years;
- *Environmental lobby:* APC's 50-year contract is being targeted with the goal of closing operations;
- *Capital expenditures:* Substantial sums will be required to upgrade and maintain facilities in light of the mill's obsolescence and to remain competitive;
- *Corporate structure:* Recent industry mill sales and mill closings reflect the difficulty of remaining profitable. Consolidated sales, marketing and management allow economies that are impossible for APC with its single-mill structure;
- *EPA Settlement:* An anticipated settlement of EPA charges will cost $400,000 and bring unwanted environmental attention to the company;
- *Congress:* The isolated geographic location of APC's business limits its political support to the Alaska state delegation, whereas opposition can be sought nationally;

- *Competition:* Foreign competition has advantages in labor, marketing, fiber and environmental costs; production from South Africa alone will expand by 150,000 tons per year by 1995;
- *Media:* Outside of local outlets, the media has little sympathy for the company's position on environmental or TTRA issues;
- *NLRB exposure:* This settlement could cost as much as $4 million, but the $1 million contingent fund is more likely; and,
- *Lawsuits:* The company still faces a number of class action suits.

While the trial record contains support for most of the items discussed in the report, there is no contemporaneous factual support for the "fiber cost" and "fiber supply" consequences attributed to the TTRA.

The descriptive portion of the report closes with a brief recitation of the three Unilateral Terms. The report then reviews the possible alternatives for the company's future—maintain the status quo; close both mills or just the pulp mill; sell the mills, more likely only the sawmill; employee ownership; and a Federal buy-out.

It is instructive to review the observations and assumptions underlying some of these alternatives. As to a decision to "Keep Everything Going:"

**1. Keep Everything Going.** This assumes that the company can and will sustain the costs associated with the pulp mill and the sawmill in a business climate that precludes profitability. Management would seek the best result in its dispute with the Forest Service and would commit to making the necessary capital investments to maintain and update the pulp mill. In addition, the company would invest in newly required air and water quality technology as it becomes necessary. Under this scenario the company may choose to file suit against the Forest Service but would do so knowing that *even an eventual victory alone would not provide the framework for operating profitably.*

In contrast, closing the pulp mill:

**3. Close the Pulp Mill—Continue to Operate Sawmill.** This alternative would test the Forest Service resolve and its interpretation of the 50–year contract about whether the company could continue to operate the sawmill without the accompanying pulp operation. The company would demonstrate that it was forced to close the pulp mill because of changes in the Forest Service administration of the 50–year contract. The company could assert that its continuing operation of the sawmill was an attempt to save part of the job base. Community and legislative support for keeping the sawmill operating would be sought. Part of this alternative might be to seek outside capital from the State and/or Native Corporations to convert the Sitka mill to some other product. It would provide the local community and the State of Alaska with a strong incentive to help find the financing to preserve some of the Sitka [sic] jobs. The very effort to seek a conversion of the mill would be a good faith gesture by the company to protect the community. The company could consider underwriting a search by the State of Alaska and Sitka leaders to find a suitable alternative. It is likely that one of the national environmental organizations would be willing to participate in this endeavor. It could be a prototypical undertaking to help a community through a tough transition, a progressive approach that could be used elsewhere if successful.

*Id.* at 6–7 (emphasis added).

It is clear from this review that Mr. Hough's report sees closing the pulp mill as the only realistic option. The final two pages of the nine-page report are devoted to this recommendation. The section starts without any equivocation: "An assessment of the alternatives and financial realities leads to the recommendation that the pulp mill be closed." Hough Report (Dec. 23, 1992) at 8.

It continues with what it calls the "rationale" for closing the mill which attributes the "ruined business climate" to unilateral changes imposed by the TTRA:

> The rationale for closing the pulp mill would be clear: "Unilateral changes to the 50–year contract, overwhelming environ-

mental constraints, and the diminishing fiber supply and cost resulting from the Tongass Timber Reform Act have ruined the business opportunity in Sitka. Repeated and emphatic overtures to the Forest Service failed to resolve key issues making this closure necessary."

*Id.* (quotation marks in original).

This "rationale" is more accurately understood as the public relations justification for the mill's closing. Its very premise is belied by the recognition that the business climate, any more than litigation victory, offers "no reasonable prospect of profitability:"

> No one faces the prospect of a mill closure with any sense of enthusiasm. Certainly APC would prefer a business opportunity that could, at a minimum, break even. However, current and future prospects do not favor profitability. In fact, future projections based on the whole range of issues outlined earlier in this report spell out financial challenges beyond management's control. *There is no reasonable prospect of profitability.*

*Id.*

This public relations rationale for the company's mill closure no longer includes any references to the declining pulp market, the increasing foreign competition, future expenditures for environmental technology, expenditures for maintenance and refitting of the mill, or the obsolescent one-mill corporate structure—all adverse conditions that have nothing to do with the TTRA or the Unilateral Terms—and which both internal reports stress.

The report concludes by outlining the "strategy" for this end game—including the preservation of the sawmill operation, a "best effort" to resolve differences with the Forest Service, a "thoughtful communications program" aimed at community, state, and Federal leaders, and a legal action for damages that "hopefully" might produce a Government buy-back offer.

Mr. Hough maintained at trial that Mr. Ishiyama resisted the recommendation to close the mill, and Mr. Ishiyama's video deposition shows him vigorously rejecting the idea. We do not find Mr. Ishiyama's first-

hand or second-hand protestations credible for a number of reasons. He had been warning for years of the possible need to close operations. He had received bad financial news from IBJ in July, and he had hired a public relations consultant who had confirmed his premonitions.

Evidence of Mr. Ishiyama's actual position was not long in coming. In February 1993, Mr. Hough sent Mr. Ishiyama a letter proposing a continued public relations retainer for Mr. Hough's firm in anticipation of a decision to close the mill. In an undated memorandum to his daughter, Mr. Ishiyama reports that he has put Mr. Hough on retainer and outlines a plan leading to the possible closure of one mill. In late February, Mr. Roppel and Mr. Huse journeyed to Japan to meet with Mr. Ishiyama and AP Ltd. officers, and to discuss the mill shut-down. Three months later, in May, Mr. Ishiyama informed Mr. Roppel of his decision to close the pulp mill and APC began its exploration of its "good faith gesture."

### The MDF Venture

Although the same rules of causation apply, often as a practical matter "evidentiary hurdles to recovering lost profits for a new venture are high." *Energy Capital,* 302 F.3d at 1328. Plaintiff was unable to meet these hurdles in its case for damages based on MDF.

When Mr. Ishiyama formally advised Mr. Roppel of his decision to close the mill, APC also started looking into a drastic change of its operations. In lieu of the discontinued pulping process, the company had to provide another means of satisfying the primary manufacture element of its contract. On June 30, when APC formally announced that it intended to suspend operations by the end of September, it did not, however, indicate the end of its contractual relationship with the Forest Service. APC assured the Forest Service that the company would pursue an alternative means of manufacturing the timber it harvested. This was consistent with the Hough Plan, as was a letter to Governor Walter Hickel, also on June 30, blaming the shutdown on the TTRA.

The "chosen" alternative: replacement of the pulp mill with a facility capable of manufacturing from its harvested pulp·wood a pressed wood product known as Medium Density Fiberboard (MDF). Provided it was feasible to convert the pulp mill, this option held out the prospect of alleviating many issues. At least in the abstract, MDF production would not entail prohibitive environmental control measures because there was no effluent discharge. And MDF would free APC from its dependence on the declining Japanese rayon market.

At trial, the Plaintiff attempted to show that it intended to shift its operations to the manufacture of MDF and that the process was so advanced as to support a claim of lost profits from MDF production. But the evidence reveals a studied refusal by APC to commit itself to the MDF venture. And there are a number of unexplained aspects of the MDF venture that cause us to reject APC's claims.

As a first step in this conversion, the company required a feasibility study to satisfy itself, investors and the Forest Service that it had the means to overhaul the existing pulp mill to produce MDF. After advising the Forest Service that it was exploring alternative wood products, APC began contacting MDF manufacturers to investigate the market for the product. But it waited a full 6 weeks, until June 16, to commence with a "preliminary" feasibility study.

Columbia Engineering (CE) was commissioned to do the preliminary study. It reported a month later, on July 13, that MDF presented an "excellent profit opportunity." Tr. 2293. But the report consisted of little more than broad cost estimates, scope of work, and a recommendation and proposed schedule for a full-scale study. Besides being the next logical step, state financial support for the project was predicated on such a favorable feasibility study.

In response to CE's proposal for a full study, APC balked. Mr. Roppel was cautioned, presumably by Mr. Ishiyama, not to spend any money on outside consultants, meaning CE. On August 10, 1993, Mr. Roppel wrote to CE's Stephen Vajda, whom APC hired as its MDF consultant: "Alaska Pulp will be moving ahead on a slow bell on this

project in the foreseeable future." Tr. 2464. While at trial APC offered a defensive and unconvincing rationale for this instruction, at the time the company offered no explanation. APC did not contact CE or Mr. Vajda again until late January 1994.

The Forest Service rightly questioned APC's resolve to pursue the new enterprise. When APC notified the Forest Service that it planned to indefinitely suspend pulp mill operations, the Forest Service responded with renewed urgency for APC to provide a realistic plan to reopen the existing mill or an alternative facility. By mid-July, the Forest Service had given an informal opinion that MDF manufacture would qualify to meet the terms of the contractual commitment to operate a pulp mill, an opinion APC might also have sought from its attorneys, but did not. It also informed APC that it viewed the suspension as a breach of contract.

The evident urgency of the situation was not mirrored in APC's actions. APC made intermittent inquiries over the next several months directed at others in the MDF field, but it was plain that APC's next step had to involve the commissioning of the full-scale feasibility study. Only then could APC clearly signal to the contracting officer that it was capable of performing this contract with a realistic substitute plan. For the next 3 months, APC continued to analyze market trends and investigate MDF versus pulp manufacture, even as it sold its mill pulping equipment and laid off key staffers at the mill.

It was not until early 1994, after the contracting officer had issued a notice to terminate the contract, that APC apparently commissioned CE to begin the full feasibility study of converting the pulp mill. According to Mr. Vajda, the decision to go forward with the study was communicated to him in late January 1994, presumably in a phone conversation since there is no document confirming this instruction. This was followed by his site visit to the mill in February.

Yet a number of expected things did not happen following the supposed go-ahead instruction and the visit. Surprisingly, Mr. Vajda did no work on the feasibility study after the site visit. There has been no expla-nation for this inconsistency. One may speculate on what actually took place between Mr. Vajda and the APC leadership during that visit, but the fact remains that Mr. Vajda did no work and billed no work after the visit. His total bill was 15 hours for the site visit. There were no communications from APC about CE's progress on the study. In fact, there were no subsequent communications between Mr. Vajda and APC at all.

There were also no communications between APC, CE, and the Alaska Industrial Development and Export Authority (AIDEA) about the Vajda feasibility study. On January 28, 1994, APC obtained an agreement from the state agency to fund an MDF feasibility study up to $200,000 and, depending upon the results, to finance APC's conversion project. However, AIDEA made it clear that it wished to review the study parameters before the exercise began, and it wished to participate closely in the actual work. APC presented no evidence that it satisfied any of these requests or pursued this funding in earnest.

Mr. Vajda testified that APC did not forward the CE plans to AIDEA, nor to his knowledge did it inform the state agency that it had commissioned CE. He testified that at the time he was unaware of AIDEA's proposed role in the study, and was never in communication with the agency following the submission and acceptance of CE's proposal.

This testimony reveals that APC's contemporaneous representations to the Forest Service were overstated, to say the least. In a letter dated December 20, 1993, for instance, Mr. Woodbury told the contracting officer, Mr. Michael Barton, that APC was "taking the next step" in its MDF project. Specifically, he indicated "We are starting a feasibility study that is preliminary to a funding request from Alaska Industrial Development and Export Authority (AIDEA)." There was no such study commissioned at that writing.

Similarly, in a January 10, 1994, letter to the Assistant Secretary of Agriculture, Mr. Ishiyama made it appear that the study he had resisted up to that time was now underway. And Mr. Woodbury apparently followed up this letter with a call to Mr. Barton,

which clearly yielded the impression that Mr. Ishiyama was doing a feasibility study, the findings of which may lead to financing of MDF conversion. *See* Email from Mr. Barton dated Jan. 11, 1994 (Subject: Woodbury Called). There was no mention of CE or any discussion of the details of these studies. That is, of course, because no feasibility study had been requested of CE, which had not even heard from APC since Mr. Roppel's "slow bell" direction.

Mr. Ishiyama was the only witness who could explain these anomalies and reconcile these inconsistencies in APC's case. Without his trial testimony, we are left with a record that compels the conclusion that APC was never committed to MDF, but was simply implementing the Hough public relations plan. APC produced scant evidence of real preparation for the new technology. At trial Defendant objected to the introduction of a demonstrative MDF time line prepared by the Plaintiff. The demonstrative notes MDF "events" between May 1993 and April 1994. However, few of these "events" have any real substance or exhibit a concrete commitment to this new endeavor. We saw no marketing plans, no personnel readiness, no actual financing, and no construction scheduling and, of course, there was no full feasibility study. As near as we can tell, the conversion was never presented to the shareholders or to IBJ. We are not persuaded that APC ever made a serious commitment to pursue the MDF proposition.

### The End of the Contract

When the company announced its intentions on June 30, it characterized the mill's closure as an "indefinite suspension." The use of this term is curious. The contract makes provision for temporary shutdowns for technical reasons, and APC experienced such temporary mill suspensions in the past. The contract also had a *force majeure* clause which would arguably authorize APC to halt mill operations during downturns in the market. § 5a(2). A truly temporary suspension at this time would require keeping employees on salary, renovation of existing machinery in need of maintenance—especially the pulp mills wood digesters—and expenditures or commitments to expenditures for environmental improvements. It would also require some kind of reassurance to employees and existing customers that production would resume within some defined time-span, and some kind of expedients to ensure that these customers' needs could be satisfied in the necessarily brief interim without risk of losing them to competitors.

The actions APC took following the September 30 shutdown are inconsistent with a possible resumption of operations. Beginning with the June 30 announcement/Sept 30 shutdown, APC began disbanding its workforce, letting go managers and skilled technicians, such as Dr. Gary Bowen and Mr. James Evensen in October, with no re-entry plan in place. In August, it also began informing its competitors, primarily Ketchikan, of the technical details of its buyers' requirements. By September, APC expected its customers would be looking elsewhere for substitute suppliers. It sold off its pulping machinery. And from the time of the announcement, Messrs. Bowen and Roppel each were doubtful that once closed, the mill would ever reopen. Mr. Huse stated that as of December 1993, there were no plans to reopen the mill.

### Conclusions on Causation

■■■ Based on the preceding analysis and findings, we conclude that APC has failed to carry its burden of showing that the Government's breach caused it harm and that it is entitled to damages. To summarize, we find that the three elements of the breach, the Unilateral Terms, did not cause the Plaintiff identifiable harm during the period prior to the pulp mill's closure. Second, we conclude that APC has presented no evidence that these three terms singly or collectively would have caused it harm over the remaining 20–year term of the contract and assertions to the contrary are pure speculation.

As we discussed at length, this company faced enormous economic pressures independent of the TTRA. None of the company's reforms or initiatives—the adoption of the mid-market test, the pursuit of broader markets, the manufacture of specialty pulps, or the entry into an entirely new enterprise in MDF—would change this. Hamstrung with debt, APC could *not* compete in any of its

ventures. The hypothetical company APC's experts depicted in establishing APC's damages simply did not stand up to the evidence.

We are persuaded by the evidence that the TTRA was not a substantial factor—indeed, no factor at all—in the closure of the pulp mill and the resulting termination of the contract. APC's actions were taken because in Mr. Hough's (and perhaps Mr. Ishiyama's) words, "[t]here is no reasonable prospect of profitability." We have found no reason to disagree with this assessment. Consequently, any damages would constitute a windfall, irrespective of the question of causation. We do not award damages in lost profits to a plaintiff who could never seem to find profits in the first instance. *See, e.g., Suess,* 52 Fed.Cl. at 226–27 (Court denied shareholder plaintiffs' lost profits based on poor track record for generating operating income or core earnings); *see also, Admiral,* 57 Fed.Cl. at 434–35. Plaintiff is due nothing at all, as it has failed to clearly establish a "reasonable probability of damage." *Cal. Fed.,* 245 F.3d at 1350.

### Conclusions on Alternative Theories of Restitution

■ In addition to its damages claims under expectancy, cover and reliance, APC also asserts the alternative non-causation theory of restitution. As we noted earlier, rather than enforcing the contract, as the other theories do, restitution seeks to place the parties back in the position they occupied before the contract was made—in concept it rescinds the contract. It does this by returning any benefit the non-breaching party conferred on the defendant in performing the contract, offset by any benefit the plaintiff received from the defendant. The United States Court of Appeals for the Federal Circuit has characterized restitution as "an alternative remedy for breach of contract in effort to restore the innocent party to its pre-contract status quo, and not to prevent the unjust enrichment of the breaching party." *LaSalle Talman Bank, FSB v. United States,* 317 F.3d 1363, 1375 (Fed.Cir.2003).

■ Restitution is singularly inappropriate as a remedy in this case. This contract was performed conscientiously and with only relatively modest friction for 30 years. It is a non sequitur and a practical impossibility to "undo" a contract after such extended performance by both parties.

Moreover, if we look to the original objectives of the contract, its recitals—which were reaffirmed on the eve of the TTRA—the benefits are peculiarly immune to valuation. The Government sought and presumably received a catalyst to industrial development in Southeast Alaska from the primary manufacturing performed by APC—the pulp and sawmill operations. It is impossible to measure that value and APC did not try. Similarly, the restoration and support of a major industrial sector of the post-war Japanese economy—the benefit conferred by the United States through APC—is also not susceptible to valuation.

To escape these obstacles, the Plaintiff has a two-pronged restitution claim based, alternatively, on the value of the pulp mill and the value of its absence. The second of these theories, the so-called "non-use value," is based on the argument that the Forest Service benefitted from its breach in that the Tongass National Forest, without the operation of the pulp mill and the harvest upon which that operation relies, is a pristine environment. To establish damages under this benefit-conferred rationale, APC's expert, Dr. Ralph D'Arge, attempted to value the natural resources in the region. The resulting damages claim is $8.7 billion.

Besides the fact that Dr. D'Arge's valuation method was developed to quantify the loss caused by criminal negligence in the Exxon Valdez oil spill, and has never been used in a contract damage context, there are other fundamental problems with the claim. First, in concept this is a benefit flowing from an alleged Government breach, and not a benefit conferred by Plaintiff. It is thus an "unjust enrichment" or tort-related disgorgement remedy which this Circuit has never approved. Second, to credit a failing company with the value of natural resources preserved by its non-performance is a perverse result that would amount to a windfall.

Another of Plaintiff's restitution arguments is found in its claim for the costs of constructing the pulp mill and related facili-

ties it provided under the contract (some variation of the value of the pulp mill claim was also pursued as part of Plaintiff's expectancy and reliance damages). APC's total for this claim is $76.5 million. This figure includes wind-down costs—which would have been incurred at the natural end of the contract irrespective of the breach—and excludes any offset in the value obtained by selling its equipment.

These damages are more aptly labeled reliance damages. *See id.* at 1376 ("When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning as damages the costs incurred in reliance on the contract.")(citing *Acme Process Equipment Co. v. United States,* 171 Ct.Cl. 324, 347, 347 F.2d 509 (1965)). As such, they would fail in the absence of established causation. *See, e.g., Westfed,* 52 Fed.Cl. at 159.

More importantly, any postulation of "money-back restitution" must not lose sight of the fact that substantial performance has already taken place, and APC has fully recouped the value of that investment through its 30–year operation of the mill. This is evidenced by the fact that the investment has been fully depreciated. This case is far different from the restitution of money paid to Defendant for oil drilling privileges it never received. *See Mobil,* 120 S.Ct. at 2437.

One other claim, which we have only briefly addressed, is urged upon us under the theory of restitution: the value of APC's relinquished claims in an independent lawsuit. As we described in our summary, APC challenged the Forest Service's administration of the contract in 1987 with a claim for over $80 million. This claim was based on disputes regarding deficit timber, and had nothing to do with the as yet not enacted TTRA. However, that lawsuit did culminate in the settlement contract and the application of the mid-market test to future timber offerings. APC now claims that the Government should not escape the millions of dollars in potential liability it faced in that suit, that it

is but one more way the Government has been unjustly enriched by its breach.

This argument fails for the same reason the non-use value theory fails—the relinquishment of those claims is in no way related to APC's "costs incurred in performing the contract," the grounds for obtaining restitution. *LaSalle Talman,* 317 F.3d at 1376. The release of those claims was a knowing and tactical decision by an informed litigant. As we have suggested in portions of the foregoing Opinion, the settlement process coincided with the well-publicized evolution of the TTRA. With every remedy available to it, the Plaintiff voluntarily determined to continue to perform the contract, as modified.

Moreover, the withdrawal of claims pursuant to a settlement cannot be valued here. Certainly it cannot be valued by the amount for which a party sued, especially without a finding of liability on that wholly separate legal theory. It would entail a trial within a trial, worthy of a Shakespearean drama, and would likely require far more than the 6 weeks we spent on the TTRA. Nor should it be valued, as APC attempted to do, by Government estimates of potential liability for terminating the long-term contract. Once again, we have relied upon neither the termination by the contracting officer nor the unsupplied timber following that termination in considering damages resulting from the TTRA. We conclude that a settlement agreement in an entirely different case, relating to an entirely different allegation of breach, is a corollary matter upon which it would be improper to base damages, restitution or otherwise. We also do not find that it is appropriate to resurrect those claims at this juncture, notwithstanding Plaintiff's request that we do so. This marathon litigation has run its course in this Court—the next step for APC, if it chooses to take that step, is the Court of Appeals.

## FINAL THOUGHTS

We would be remiss if we closed this opinion without expressing our appreciation to counsel for the legal skill and professionalism with which they tried this case. Although this litigation was characterized in its early phases with evident hard feelings and many

unnecessarily bitter disputes between counsel, in more recent years that gave way to a business-like and efficient attitude on both sides. Nowhere was this more evident than during the damages trial, which was marked by relatively few evidentiary objections, most of which were resolved by the parties without the need for intervention by the Court. The Court is indebted to counsel as well for the excellence of their advocacy in this most challenging factual and legal case.

## CONCLUSION

Plaintiff is entitled to no damages for the Government's breach of contract. The Clerk is directed to dismiss the Plaintiff's Complaint and to enter judgment in favor of the Defendant.

On February 28, 2004, the parties shall file a Joint Status Report indicating whether further proceedings are required to address the matter of sanctions for Mr. Ishiyama's contempt, which was only partially resolved in this Decision.

**IT IS SO ORDERED.**